IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



**FILED**

SEP 2 5 2014

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| SWAN VIEW COALITION, FRIENDS OF THE WILD SWAN, NATIVE ECOSYSTEMS COUNCIL, and ALLIANCE FOR THE WILD ROCKIES, | CV 13–129–M–DWM |
| Plaintiffs, | ORDER |
| vs. | |
| CHIP WEBER, Flathead National Forest Supervisor, FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior, | |
| Defendants. | |

## INTRODUCTION

This is an action for declaratory and injunctive relief pursuant to the

National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 et seq., the

National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., and the

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq. Plaintiffs are various

environmental organizations that challenge the United States Forest Service's

1

("Forest Service") and the United States Fish and Wildlife Service's ("Fish and Wildlife Service"): (1) authorization of the Glacier Loon Fuels Reduction and Forest Health Project ("the Project") on the Flathead National Forest and (2) failure to conduct environmental analysis for decisions regarding the "Legacy Lands" acquisition, operating procedures, and subsequent logging projects in the grizzly bear and lynx analysis areas for the Project. The parties' respective motions for summary judgment, (Docs. 20 and 28), are granted in part and denied in part. Plaintiffs' motion to supplement, (Doc. 14), is denied.

BACKGROUND

## I. Legacy Lands Acquisition

In 2009, the Forest Service acquired title to approximately 111,740 acres of private land previously owned by The Nature Conservancy, known as "Legacy Lands." X21:59449-60058.[1] The lands were previously held by private parties and are intermingled with Forest Service lands. X21:59557. The Nature Conservancy received a $250 million tax refund for the acquired lands, and the Forest Service paid $1.00 in consideration. X21:059559-60. The Nature Conservancy vested all trees of merchantable timber value as reserved logging

---

[1]    Citations to the administrative record are formatted as Z1:12345, where "Z1" represents the document number, and "12345" the bates-stamped page number.

2

rights pursuant to 36 C.F.R. § 251.14. X21:59450-51. The Nature Conservancy's deed to the Forest Service was also made subject to the "USFS-TNC Agreed Operating Procedures Regarding Reserved Timber Harvest Rights" ("Agreed Operating Procedures"). X21:59451. The Agreed Operating Procedures "set[] forth the terms and conditions under which [The Nature Conservancy] exercise[s] its Timber Rights Reservation and manage[s] incidental and related matters" on the donated lands in question. X21:59526.

## II.    The Project

The Project includes 37,320 acres and extends south and west of Condon, Montana on the west side of Montana Highway 83 to the south end of Lindbergh Lake. V2:44344. It includes 29,364 acres of public (i.e., National Forest system) lands and 7,956 acres of private lands. V2:44468. It implements a variety of national, regional, and local management directives to reduce the risk of high severity wildfire in areas of the Flathead National Forest. V3:44912. The Project is also being undertaken to improve and maintain healthy forest stands, to prevent insect and disease infestations, and to provide timber for commercial use. V2:44913. The Project undertakes these objectives through ten different types of silvicultural treatments on roughly 1,400 acres. V3:44969. It provides access to treated units through an estimated 5.9 miles of temporary road construction and

provides for the closure and decommissioning of an estimated 8.4 miles of National Forest System road. V3:44911.

In August 2012, the Forest Service published the Environmental Assessment ("EA") for the Project. V2:44338. Several species listed under the ESA are present in, or have designated critical habitat in, the Project area. The Project is located in the Northern Continental Divide Grizzly Bear Ecosystem, within the designated "grizzly recovery zone." V2:44635. The grizzly recovery zone is divided into Bear Management Units and further divided into bear management subunits. V2:44633. The Project is located primarily within the boundaries of the Glacier Loon subunit, and a small portion falls within the Buck Holland subunit. V2:44344. The Project area also lies within six different Lynx Analysis Units. V2:44658-59.

The Forest Service analyzed each of the protected species in a Biological Assessment and concluded the Project would have no effect on bull trout, bull trout critical habitat, and water howellia.[2] J1:16393, N2:26711. The Forest Service determined the Project would not result in jeopardy to the wolverine population. H17:2946-51, H160:11901-903. The Forest Service also concluded

---

[2]     Water howellia is a threatened plant species under the ESA. 59 Fed. Reg. 35860 (July 14, 1994).

the Project is not likely to adversely affect the grizzly bear, H16:2856, will not have significant large-scale negative cumulative effects on Canada lynx, X20:59423, and is not likely to adversely modify or destroy lynx critical habitat, X47:60948.

On February 13, 2013, the Forest Service signed the Decision Notice/Finding of No Significant Impact authorizing the Project. V3:44908. Plaintiffs filed a timely administrative appeal, W2:45338-596, which the Forest Service denied, W19:45828; W21:45845; W23:45863; W25:45876. The Project was expected to commence as early as July 14 or 15, 2014, (Garrity Dec., Doc. 37-1 at ¶ 9; Clay Dec. 38-1 at ¶ 4), and to be fully completed by 2019, V3:44927. On July 1, 2014, Plaintiffs moved for a preliminary injunction to prevent the Project from moving forward. (Doc. 36.) On July 14, 2014, this Court denied that injunction, (Docs. 40 and 41), and on July 15, Plaintiffs appealed that decision to the Ninth Circuit, (Doc. 42). The appeal of this Court's ruling on the preliminary injunction remains pending. Because an appeal under 28 U.S.C. § 1292(a)(1) from an interlocutory order involving a preliminary injunction does not divest the district court with jurisdiction to proceed with a decision on the merits, absent a stay order issued by the Court of Appeals, this Court may proceed on the merits of the parties' motions for summary judgment. *See Ex parte Natl. Enameling &*

*Stamping Co.*, 201 U.S. 156, 162 (1906) ("The case, except for the hearing on the appeal from the interlocutory order, is to proceed in the lower court as though no such appeal had been taken, unless otherwise specifically ordered."); *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982).

Plaintiffs raise a number of concerns regarding the Project, including: (1) whether the Forest Service's "no effect" determination for water howellia and bull trout is arbitrary and capricious; (2) whether the procedural requirements of the ESA were met in regards to the wolverine; (3) whether the Project violates NFMA; (4) whether the agencies' analysis regarding grizzly bears, lynx, and lynx critical habitat is sufficient; and (5) whether the Forest Service's decision not to prepare an environmental impact statement ("EIS") is arbitrary and capricious.

## SUMMARY CONCLUSION

Although Plaintiffs raise numerous challenges to the Glacier Loon Project and the Legacy Lands acquisition and logging projects, very few of Plaintiffs' claims have merit. In all respects, except the following, the Forest Service has complied with both the ESA and NEPA. Plaintiffs correctly contend that the agency was required to engage in ESA and NEPA analysis in the creation of the Agreed Operating Procedures and for site-specific logging projects in the Project area. Regarding the analysis of the Project, the Forest Service's "no effect"

6

determination for water howellia and bull trout is arbitrary and capricious, and the Forest Service failed to follow the necessary procedures under the ESA after reaching a "may affect" conclusion for the wolverine. Further, the Forest Service applied the incorrect standard under Amendment 19, requiring it to reconsider its Section 7 analysis of grizzly bear under the numerical access objectives in the Forest Plan.

## LEGAL STANDARDS

### I.   Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

### II.   Administrative Procedure Act

Courts review claims regarding the ESA, NEPA, and NFMA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. *See Native*

*Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (ESA and

NEPA); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011)

(NEPA and NFMA).  Under the APA, a "reviewing court shall hold unlawful and

set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The

Court's scope of review is narrow, and the Court should "not [] substitute its

judgment for that of the agency."  *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A decision is arbitrary and

capricious:

> only if the agency relied on factors Congress did not intend it to
> consider, entirely failed to consider an important aspect of the problem,
> or offered an explanation that runs counter to the evidence before the
> agency or is so implausible that it could not be ascribed to a difference
> in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgt.*, 638 F.3d 1217, 1224 (9th Cir. 2011).

An agency's actions are valid if it "considered the relevant factors and

articulated a rational connection between the facts found and the choices made."

*Id.* (internal quotation marks omitted).  As long as the record supports the

agency's decision, that decision should be upheld even if the record could support

alternative findings.  *Ark. v. Okla.*, 503 U.S. 91, 112-13 (1992).  Review of the

agency's action is "highly deferential, presuming the agency action to be valid."

*Buckingham v. Secy. of U.S. Dept. of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).

However, this presumption does not require courts to "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A.*, 464 U.S. 89, 97 (1983) (internal quotation marks omitted).

## ANALYSIS

## I.    The Legacy Lands Acquisition

A federal agency is only required to perform analysis under the ESA and NEPA if the conduct in question amounts to "agency action" under the ESA or "major federal action" under NEPA. There is no ESA or NEPA analysis for the Legacy Lands acquisition or the reserved logging rights on those lands. X15:59357-59. Plaintiffs contend the acquisition of the Legacy Lands, the operating procedures for the reserved logging rights, and the site-specific logging projects all qualify as "agency action" and "major federal action" and the Forest Service is therefore required to perform analysis under the ESA and NEPA with regard to those actions. Considering the Agreed Operating Procedures and site-specific logging projects, Plaintiffs are correct.

### A.    Agency Action

9

Section 7 of the ESA defines agency action as "any action authorized, funded or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2). The ESA implementing regulations provide:

> Action means all activities or programs of any kind authorized, funded or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02. The term "agency action" is interpreted broadly. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) [hereinafter *Karuk Tribe*]. "Under [] established case law, there is 'agency action' sufficient to trigger the ESA consultation duty whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Id.* at 1027. The "agency action" inquiry is two fold. First, has a federal agency affirmatively authorized, funded, or carried out the underlying activity? Second, does the agency have some discretion to influence or change the activity for the benefit of a protected species? *Id.* at 1021. The complicating question here is to what extent Section 7 of the ESA applies where a private entity has vested logging rights on land donated to the Forest Service and the impact of the Forest Service's continued ability to influence private conduct

10

when its authority is limited by the terms outlined in the Agreed Operating Procedures.

### 1. Legacy Lands Acquisition

Plaintiffs first argue the acquisition of the Legacy Lands qualifies as "agency action" requiring consultation under the ESA. The land in question was "donated to the United States . . . for the Forest Service . . . at no cost to the United States." X21:59525; 7 U.S.C. § 2269 (governing gifts of property to the United States Department of Agriculture). Pursuant to Title 7 of the United States Code, the Secretary is "authorized to accept, receive, hold, utilize, and administer" gifts of land. 7 U.S.C. § 2269. Defendants argue, however, that the Secretary had no choice but to accept the donation pursuant to the statute governing conservation bonds. Pursuant to 26 U.S.C. § 54B(e)(2), under "qualified forestry conservation bonds," "[a]t least half the land acquired [by a State or non-profit organization] must be transferred to the United States Forest Service at no net cost to the United States." This provision gives no discretion to the Forest Service to decide whether or not to accept the donation. This means the requirements of *Karuk Tribe* have not been met and the acquisition of the land is not "agency action" under the ESA.

### 2. Agreed Operating Procedures

On March 9, 2010, The Nature Conservancy and the Forest Service entered

11

into the Agreed Operating Procedures to manage The Nature Conservancy's commercial logging projects on the Legacy Lands. X21:59541. "Negotiating and executing contracts constitute agency action under the ESA." *Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dept. of Energy*, 232 F.3d 1300, 1306 (9th Cir. 2000); *Nat. Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998). The joint promulgation of the Agreed Operating Procedures here shows affirmative authorization by the Forest sufficient to fall within the broad definition of "agency action" under Section 7 of the ESA. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1508 (9th Cir. 1995) (noting that "after enactment of the ESA the execution of a reciprocal right-of-way agreement clearly would implicate section 7(a)(2)"); *Conner v. Burford*, 848 F.2d 1441, 1454-58 (9th Cir. 1988) (holding the Bureau of Land Management must comply with Section 7 by identifying all potential impacts on a protected species of all post-leasing activities before entering into lease agreement). In authorizing the Agreed Operating Procedures, the Forest Service also had the discretion to implement more protective measures for protected species. *See Nat. Resources Defense Council v. Jewell*, 749 F.3d 776, 784-85 (9th Cir. 2014) (en banc) (finding agency action where agency had ability to renegotiate different contract terms for the benefit of protected species). The promulgation of the Agreed Operating

12

Procedures is "agency action" requiring analysis under the ESA. The Forest Service is enjoined from proceeding under the terms of the Agreed Operating Procedures until the necessary analysis is performed.

### 3.    Site-Specific Logging Projects

As a preliminary matter, there may be an issue as to whether or not this issue is moot as Defendants have indicated all logging projects by The Nature Conservancy in the Glacier Loon analysis area have been completed. (Doc. 35 at 7); X20:59407 ("Harvest plans for . . . projects in the Glacier Loon and Buck Holland subunits which have been received have been for the Fredswood, Last Gasp, Barber Chair, Beaver Highway Projects. These projects have been completed."); X20:59422. Although the record indicates "harvest activities are expected to continue on Legacy Lands," X20:59422, its does not state whether such lands would be in the Project area. The Ninth Circuit has held an environmental claim moot where remedial action is no longer available. *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir. 1988) (regarding a challenge to a completed mining project). Neither party addresses this issue.

"Where private activity is proceeding pursuant to a vested right or to a previously issued license, an agency has no duty to consult under Section 7 if it takes no further affirmative action regarding the activity." *Karuk Tribe*, 681 F.3d

13

at 1021. "Similarly, where no federal authorization is required for private-party activities, an agency's informal proffer of advice to the private party is not 'agency action' requiring consultation." *Compare id.* at 1021, 1023 (finding the Forest Service's approval, denial, and continued compliance inspections of "Notices of Intentions to Mine" demonstrated the Forest Service's actions were not merely advisory but provided the agency with discretionary control) *with Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074-75 (9th Cir. 1996) (finding informal advice given by an agency under its power to enforce Section 9 of the ESA does not give rise to an affirmative act) *and Sierra Club*, 65 F.3d at 1511 (finding the federal agency lacked the discretion to influence the private action where the project could proceed without authorization and the agency's discretionary control was severely circumscribed).

The facts here fall between *Karuk Tribe* and *Sierra Club*. Like the situation in *Karuk Tribe*, The Nature Conservancy is required to submit a proposed Harvest Plan to the Forest Service before it engages in harvest activity. The Forest Service then issues a Harvest Plan Notice stating whether or not the proposed harvest complies with the Agreed Operating Procedures within fifteen business days. X21:59536. However, similar to the situation in *Sierra Club*, the Forest Service's discretion is circumscribed as it can only consider compliance with the Agreed

14

Operating Procedures in its review of the Harvest Plan, X21:59537, and, arguably, the harvest can go forward without any affirmative action on the part of the agency, X21:59536 (stating that if the Forest Service does not submit a Harvest Plan Notice within the requisite time, it is deemed to have accepted the plan and the harvest can go forward). Under such circumstances, it does not appear the Forest Service can do anything to stop a specific logging project from going forward.

The Ninth Circuit has voiced concern over triggering the burdensome bureaucratic procedures of Section 7 when the agency is merely providing advice as to the best way to protect a species, noting the potential to stifle desirable communications between private entities and federal agencies and that the "protection of threatened and endangered species would suffer." *Marbled Murrelet*, 83 F.3d at 1075. However, the relationship here appears to rise above an informal proffer of advice and, arguably, results in Forest Service authorization of the individual projects. Although a close question, the first prong of the *Karuk Tribe* test has been met.

Equally debatable is whether or not the Forest Service has discretion or control over the private action in question, implicating the second prong of the *Karuk Tribe* inquiry. Unlike the governing document in *Sierra Club*, the Agreed

Operating Procedures include provisions requiring environmental protections be upheld, such as compliance withe the Swan Valley Grizzly Bear Conservation Agreement and the Native Fish Habitat Conservation Plan. X21:59527. The reserved logging rights regulation also provides the Forest Service with discretionary control as it requires agency approval of road building activities. 36 C.F.R. § 251.15(a)(5). Recently, the Ninth Circuit reasserted the low standard for discretionary control in assessing "agency action," holding that "so long as a federal agency retains 'some discretion' to take action to benefit a protected species," Section 7(a)(2)'s consultation requirement is triggered. *Nat. Resources Defense Council*, 749 F.3d at 784. Moreover, "[t]he agency lacks discretion only if another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit." *Id.*; *see also Turtle Island Restoration Network v. Natl. Marine Fisheries Serv.*, 340 F.3d 969, 976-77 (9th Cir. 2003) (holding that because the Compliance Act entrusted the Fisheries Service with discretion to issue permits to inure to the benefit of the species, ESA consultation was required). In this case, the Agreed Operating Procedures do not deprive the Forest Service of discretion to shape future logging plans for the benefit of protected species.

Because both prongs under *Karuk Tribe* have been met (agency

16

authorization and discretionary control), the approval of site-specific logging projects amounts to "agency action" under the ESA. As there are no current site-specific projects in the Project area, the agency must perform the requisite analysis for future site-specific projects in the Project area.

## B.    Major Federal Action

NEPA requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions before making a final decision to proceed. *St. of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Pursuant to NEPA, an agency must follow certain procedural rules and perform specific analysis for "major federal actions" that may significantly affect the environment. 42 U.S.C. § 4332(2)(C). "Major federal actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies [and] new or revised agency rules, regulations, plans, policies, or procedures." 40 C.F.R. § 1508.18(a). Major federal action also includes the "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id.* at § 1508.18(b)(4). The existence of "major federal action" under NEPA is a jurisdictional prerequisite and is assessed based

17

on (1) the degree to which the given action is funded by the federal agency and (2) the extent of the federal agency's involvement and control. *Rattlesnake Coalition v. E.P.A.*, 509 F.3d 1095, 1101 (9th Cir. 2007). Although the "major federal action" standard is similar to the more liberal "agency action" standard under the ESA, the terms are not interchangeable. *Karuk Tribe*, 681 F.3d at 1024. NEPA requires a finding that the action in question is a major action as opposed to merely a marginal one. *Id.*; *Penfold*, 857 F.2d at 1313-14.

### 1. Legacy Lands Acquisition

As discussed above, the Forest Service did not have discretionary control over whether or not the land was accepted. This fact is distinguishable from the case relied upon by Plaintiffs, where the agency had discretion to impose terms and conditions on the transaction and approve or disapprove of the transaction based on the acceptability of the lands in question. *See RESTORE: The N. Woods v. U.S. Dept. of Agr.*, 968 F. Supp. 168, 175 (D. Vt. 1997) (finding the agency was required to engage in NEPA analysis). As the Legacy Lands acquisition does not amount to "agency action" under the more liberal standard of the ESA, it does not amount to "major federal action" under NEPA. *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1022 (9th Cir. 2012); *see Marbled Murrelet*, 83 F.3d at 1075 ("Where . . . there is no 'agency action' under what is

18

probably the more liberal standard of the ESA, there is no 'major federal action' under the more exclusive standard of NEPA.").

## 2. Agreed Operating Procedures and Site-Specific Projects

The regulatory definition of "major federal action" requiring NEPA analysis includes "new [] agency . . . procedures." 40 C.F.R. § 1508.18. "The time for an agency to give a hard look at environmental consequences, and the opportunity for serious NEPA litigation on whether alternatives were adequately considered, should come in this context at the points where an agency establishes operating criteria . . . or embarks on some significant shift of direction in operating policy . . . ." *Grand Canyon Trust*, 691 F.3d at 1022 (regarding operation of the Glenn Canyon Dam). The adoption of the Agreed Operating Procedures in the present case falls within this category of action, requiring the Forest Service to follow the requisite NEPA procedures. Similarly, "major federal action" includes the "[a]pproval of specific projects," 40 C.F.R. § 1508.18(b)(4), requiring the Forest Service to engage in NEPA analysis for future site-specific logging projects as well.

## II. The Project

### A. The Forest Service's "no effect" conclusion for water howellia, bull trout, and bull trout critical habitat is arbitrary and capricious.

19

An agency has a duty to consult under Section 7 of the ESA for any discretionary agency action that "may affect" a listed species or designated critical habitat. *Karuk Tribe*, 681 F.3d at 1027. "An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat." *Id.* "[A]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Id.* The "may affect" threshold is very low and includes "[a]ny possible effect, whether beneficial, benign, adverse or of an undetermined character." *Id.* (internal quotation marks and italics omitted).

Here, the Forest Service determined the Project "indirectly affects" water howellia but determined through the imposition of a buffer zone that the impact is sufficiently mitigated as to result in "no effect." V2:44520-21. Because this determination ignores the low threshold for "may affect," the Forest Service is required to engage in at least some consultation under the ESA. *See Karuk Tribe*, 681 F.3d at 1028 (finding the imposition of mitigation measures in an attempt to reduce impacts weighs against a finding of "no effect").

Considering bull trout,[3] the Forest Service found that although some sedimentation will occur, it will result in no impact to bull trout in the Glacier Creek watershed or at Lindbergh Lake. N2:26709-10. The Forest Service determined there would be no "downstream, cumulative effects to bull trout in Swan River or Swan Lake." N2:27710. However, the EA states the Project will have "trivial impacts on bull trout habitat in [the] Glacier Creek Analysis Area." V2:44630. This is sufficient to trigger ESA consultation under the low "may affect" threshold. *See Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079 (D. Mont. 2013) ("While the 'disturbance effects' may be discountable or insignificant . . . 'any possible effect' requires the Forest Service to obtain the concurrence of the Wildlife Service in order to avoid consultation.").

## B.    The Forest Service failed to comply with the implementing regulations of the ESA regarding the wolverine.

If within an action area a proposed species "may be present, [the action] agency shall conduct a biological assessment." 16 U.S.C. § 1536(c)(1). A biological assessment "shall evaluate the potential effects of the action on . . . proposed species . . . and proposed critical habitat . . . and determine whether any

---

[3]    Bull trout was listed as a threatened species in 1999. 64 Fed. Reg. 58910 (Nov. 1, 1999). The Fish and Wildlife Service has designated bull trout critical habitat. 75 Fed. Reg. 63898 (Oct. 18, 2010).

such species or habitat are likely to be adversely affected by the action and is used

in determining whether formal consultation or a conference is necessary." 50

C.F.R. § 402.12(a). The contents of the biological assessment are at the discretion

of the agency and depend on the nature of the action. *Id.* at § 402.12(f). "A failure

to prepare a biological assessment is comparable to a failure to prepare an

environmental impact statement." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir.

1985). "A plaintiffs' burden in establishing a procedural violation is to show that

the circumstances triggering the procedural requirement exist, and that the required

procedures have not been followed." *Id.* at 765.

Here, the wolverine was proposed for listing under the ESA on February 4,

2013, 78 Fed. Reg. 7864 (Feb. 4, 2013), and wolverines are known to be present in

the Project area, V2:44721. In September 2012, the Forest Service prepared the

terrestrial species Biological Assessment for the Project and, because it had not yet

been proposed for listing, the wolverine was not included in that assessment.

H16:2834-905. But, because the wolverine was a "sensitive species" under the

Forest Plan, the Forest Service assessed the effects of the Project on the wolverine

in a Biological Evaluation. H17: 2946-51. In that Biological Evaluation, the

Forest Service concluded the project "[m]ay impact individual [wolverines] or

habitat, but will not likely contribute to a trend towards Federal listing or loss of

22

viability of population or species." H17: 2951.[4] On February 22, 2013, the Forest

Service prepared an additional analysis on whether the Project would jeopardize

wolverines, concluding "the project would not result in Jeopardy to the wolverine

population." H160: 11901-903. Plaintiffs have failed to present any argument as

to why these two documents, when considered together, do not qualify as a

biological assessment in light of the discretion given to the agency in fashioning

such an analysis. The Forest Service has met the regulatory requirement that it

prepare a biological assessment on the wolverine.

Even so, a determination by the Forest Service in a biological assessment

that an action "may affect" a listed species gives rise to consultation under Section

7 of the ESA. *Karuk Tribe*, 681 F.3d at 1027. Formal consultation is not required

if the Forest Service finds that while a project "may affect" a listed species, the

species is "not likely to be adversely affected" and the Fish and Wildlife Service

concurs in writing. 50 C.F.R. §§ 402.12(j)-(k), 402.14(b)(1), 402.13(a). There is

no indication the Fish and Wildlife Service concurred in writing with the Forest

Service's determination regarding the wolverine. Absent such concurrence or

---

[4] Although it does not include analysis on the issue, the Biological Assessment states the "[i]mplementation of the proposed project would not jeopardize the wolverine." X20:59389.

23

formal consultation, the procedural requirements of the ESA have not been met.[5]

## C.   NFMA

NFMA provides for forest planning and management at two levels: the forest level and the individual project level. 16 U.S.C. § 1604; *Ohio Forestry Assn. v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the agency develops a Land and Resources Management Plan, i.e., "forest plan." Once the forest plan is approved, the Forest Service implements the plan by approving or denying site-specific actions. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). The Forest Service's failure to comply with a forest plan is a violation of NFMA. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). Plaintiffs challenge the Project's compliance with the Forest Plan in this case as it relates to Amendment 19, which provides protection for grizzly bears, and Amendment 21, which governs old growth forests.

### 1.   Amendment 19

Plaintiffs insist the strict numerical objectives under Amendment 19 apply to those subunits that became predominantly National Forest System lands following

---

[5]    On August 13, 2014, the United States Fish and Wildlife Service withdrew its proposal to list the wolverine as a threatened species in the contiguous United States. 79 Fed. Reg. 47521 (Aug. 13, 2014). This decision may also impact the Service's consideration of the wolverine on remand.

the Legacy Lands acquisition and the failure to meet the Amendment 19 access objectives results in unpermitted take of grizzly bears. Defendants retort Plaintiffs' "take" argument is barred because the agency did not receive proper notice of the claim under the ESA and, even if addressed on the merits, Plaintiffs' claims should fail. Plaintiffs are correct as to which access standard under Amendment 19 applies and properly provided notice under the ESA. However, the agencies did not violate Section 9 of the ESA, and it is only following remand for consideration of the correct access objective standard that the Court can determine whether the agencies' Section 7 conclusion is arbitrary and capricious.

### a. Access Objectives

The Forest Service implemented Amendment 19 to set enforceable standards to minimize negative impacts to grizzly bears from roads. T157:42799-801. Amendment 19 includes forest-wide standards for grizzly bears that provide for no net increase in open motorized access density and no net decrease in the amount or size of security core area. T157:42800. The access objectives under Amendment 19 then distinguish between lands that are predominantly (greater than 75 percent) National Forest System lands and those that are not. For those Bear Management Unit subunits comprised of predominantly National Forest System lands, numerical objectives are placed on limiting road density, and the maintenance of certain

25

percentages of security core areas is required.[6] *Id.* Subunits that are not

predominantly National Forest System lands are governed by broader objectives

that generally ensure Forest Service activities will not result in an increase in road

density or reduction in security core areas. *Id.* These "access density objectives . .

. are not discretionary." T157:42867.

The dispute in this case is whether the Amendment 19 numerical access

objectives apply to the subunits in the Project area, which include the Glacier Loon

and the Buck Holland subunits. This issue arose largely due to The Nature

Conservancy's 2010 donation of land to the Forest Service, which included land in

the Glacier Loon and Buck Holland subunits. X20:59407-409. Following the

transfer, the Forest Service's ownership percentage in the two subunits increased

above 75 percent. H2:2634. Plaintiffs insist because this meets the threshold

described in Amendment 19, the amendment applies to these subunits. Defendants

argue because The Nature Conservancy reserved its right to all merchantable trees

---

[6]     B.     Forest-wide Objectives for Grizzly Bear

On all BMU subunits that are predominantly (greater than 75 percent) National Forest System
land, our objective is to:

- limit high-density (> 1 mile/square mile) open motorized access to no more than 19 percent of a
BMU Subunit within 5 years;

- limit high-density (> 2 miles/square mile) total motorized access to no more than 24 percent of
a BMU subunit in 5 years, and no more than 19 percent in 10 years; and

- provide security core areas that equal or exceed 60 percent of each BMU Subunit in 5 years,
and 68 percent in 10 years. T157:42800.

until December 31, 2018, the Forest Service has no regulatory authority over the harvest and associated road use until that time and only the general requirements preventing net increase in road density and net decrease in security core area apply. Y8:61798.

"An agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference." *Native Ecosystems Council*, 418 F.3d at 962. Here the Forest Service has chosen not to consider the lands acquired from The Nature Conservancy in 2010 as National Forest System lands. This interpretation is inconsistent with the language of Amendment 19, which does not allow the Forest Service to exclude lands subject to reserved logging rights from its calculation of National Forest System lands.[7] If the Forest Service thinks the subunit objectives are not workable in situations involving reserved logging rights, it should propose amendments to the Forest Plan to somehow deal with situations involving reserved logging rights. *See id.* at 961 (recommending that instead of discounting the requirements of the applicable forest plan, the agency should go through the proper

---

[7]     Defendants insist because the Decision Notice for Amendment 19, T157:42806, lists the two subunits as not being predominantly National Forest System lands, it reasonably assumed they did not qualify. This static interpretation of the Forest Plan is not reasonable or persuasive. At the time the Decision Notice was written there were 14 subunits that did not qualify as predominantly National Forest System lands. However, instead of merely saying those 14 were excused from the numerical objectives under Amendment 19, the amendment applies a percentage-based standard, which implies it could—and would—apply to other subunits if their composition changed in the future.

process to amend it). Under the Forest Plan as it currently stands, the specific numerical objectives required for lands that are predominantly National Forest System lands under Amendment 19 apply to the Glacier Loon and Buck Holland subunits.

Plaintiffs argue these subunits do not currently comply with Amendment 19. V2:44644, 44657. However, the numerical access objectives themselves provide for an extended schedule of 5-10 years for compliance, T157:42800, and the schedule for Amendment 19 has been modified to "through 2018 or until the Forest Plan revision is completed, whichever comes first," Y8:61799. Arguably, this allows time for the Forest Service to bring its actions into compliance.

### b. Notice under the ESA

The ESA, 16 U.S.C. § 1540(g)(1), provides for "citizen suits" to enforce provisions of the Act. However, no suit may be commenced "prior to sixty days after written notice of the violation has been given to the Secretary." 16 U.S.C. § 1540(g)(2)(A). This notice requirement is jurisdictional and cannot be waived. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *S.W. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998). At a minimum, the plaintiff must "provide

28

sufficient information of a violation so that the Secretary or [the agency] could identify and attempt to abate the violation." *Id.* at 522.

Here, Plaintiffs' 60-day notice is adequate to put the agency on notice of a claim under Section 9 of the ESA. Plaintiffs submitted two letters indicating an intent to sue under the ESA. X6:45893-97; X16:59364-69. The first letter, dated March 19, 2013, mentions the grizzly bear, contending the "may affect, not likely to adversely affect" finding is arbitrary and capricious. X6:45896. This letter also generally provides: "The agencies have ignored their duties under the ESA . . . to ensure that . . . their actions do not result in unauthorized take of these species of wildlife." X6:45897. The second letter, dated June 20, 2013, more specifically addresses Amendment 19 and the effect of the Legacy Lands acquisition, stating "*The agencies must reinitiate and complete consultation on A19 to comply with ESA Section 7 and must receive an adequate incidental take permit to comply with Section 9.*" X16:59368 (emphasis in original). Plaintiffs' letters indicate a specific concern regarding the grizzly bear and the expected take in relation to compliance with Amendment 19. *See S.W. Ctr. for Biological Diversity*, 143 F.3d at 520-22 (finding the plaintiffs' notice inadequate where letters did not even mention the specific species in question). Plaintiffs' statements are sufficient to meet the notice requirement under the ESA.

29

## c. Sections 7 and 9 of the ESA

Plaintiffs challenge the agencies' conclusions regarding the grizzly bear
under Sections 7 and 9 of the ESA. Plaintiffs contend the agencies' Section 7
determination that the Project is not likely to adversely affect the grizzly bear is
arbitrary and capricious in light of unpermitted take occurring in violation of
Section 9. Plaintiffs are wrong.

When an agency action is likely to cause a "take" of a listed species, the Fish
and Wildlife Service may issue an "incidental take statement" setting out the
predicted impact on the species, as well as the terms and conditions of the action
that will minimize take. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). Here,
it is undisputed that all agency actions must comply with an existing incidental take
statement in order to ensure compliance with Section 9 of the ESA. Defendants
contend those adverse effects alleged by Plaintiffs have already been analyzed and
fall within the biological opinions and incidental take statements under the Swan
Valley Grizzly Bear Conservation Agreement and Amendment 19. X47:60932.
Plaintiffs insist because the Buck Holland and Glacier Loon subunits do not meet
the numerical objective requirements of Amendment 19, unpermitted take is
occurring.

Amendment 19 states that when the numerical access objectives are not met,

30

"harm" to grizzly bears occurs. Y8:61904. However, the incidental take statement

issued for the implementation of Amendment 19 recognized certain subunits would

fall under this standard and, as discussed above, set an extended schedule for

compliance. This extended schedule is reflected in Amendment 19's incidental

take statement, which states:

> If at the end of 2018, subunits do not meet A19 or amended management direction, or if at any time Forest actions result in net increases in road densities or net decreases in core, as a result of changes on the ground when comparted to the 2012 baseline, the amount of incidental take exempted here would be exceeded and reinitiation of consultation would be required.

A19 Revised Sched., Y8:61905, 61908. Therefore the incidental take statement for

Amendment 19 includes the take alleged by Plaintiffs. Even though Glacier Loon

and Buck Holland subunits currently fall under the Amendment 19 numerical

access objectives, resulting in a take of grizzly bears, that take is permitted as long

as the Project does not result in net increase in road density or net decrease in core.

The Forest Service determined it would not. X20:59410. Therefore, no Section 9

violation has occurred.

In the absence of a Section 9 violation, Plaintiffs do not provide alternative

grounds for challenging the agencies' Section 7 determination. However, the

agencies' reliance on the wrong access objectives may impact their conclusion that

the Project is not likely to adversely affect the grizzly bear. Section 7 of the ESA

31

requires an agency to ensure no discretionary action "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a). In an action area where listed or proposed species or designated or critical habitat may be present, the Forest Service must complete a biological assessment to determine if the proposed action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1). If the Forest Service determines the proposed action "may affect but is not likely to adversely affect" a listed species or critical habitat, it must engage in informal consultation with the Fish and Wildlife Service to obtain its determination with respect to the proposed action. If the Fish and Wildlife Service concurs with the Forest Service, no further consultation is required and the process ends. *Karuk Tribe*, 681 F.3d at 1027.

Here, the Forest Service prepared a biological assessment in which it determined the adverse effects to the grizzly bear are unlikely for several reasons, including, *inter alia*: (1) the activities associated with the Project would only cause short-term displacement and reductions in hiding cover and forage; (2) the active/inactive management strategy under the Swan Valley Grizzly Bear Conservation Agreement would reduce displacement and disturbance; (3) inactive

32

subunit guidelines would allow activities for a 30-day salvage period during the summer and during the bear's denning period; (4) spring timing restrictions would prevent displacement; (5) there would be no net increase in open road or total road density; (6) no net loss of habitat security or increase in motorized access is expected; (7) the Project is expected to decommission some existing roads, and proposed temporary roads will be reclaimed following use; and (8) there would be no effect to potential or known grizzly bear denning habitat. X20:59409-10. The Fish and Wildlife Service concurred. X47:60932.

It is unclear whether this Court's determination that the quantitative requirements of Amendment 19 apply to the Glacier Loon and Buck Holland subunits impacts these findings. On remand, the agencies must consider this question and, if necessary, perform the relevant analysis. Such action will enable the Court to determine whether or not the agency's adversity determination is arbitrary and capricious.

### 2. Amendment 21

Amendment 21 is intended "to ensure that old growth habitat on the Flathead National Forest is maintained and restored to provide for long-term viability of old

growth associated wildlife species."[8] T8a:33084. "Old growth associated species" "includes any wildlife species that use the various attributes of old growth forests for some or all of their ecological needs." V2:44722. Although the Project does not cut down old growth stands, Plaintiffs contend the Project violates the Forest Plan because it does not designate stands to meet necessary viability requirements. This raises two issues for the Court: first, whether the viability percentage outlined in the Forest Plan is mandatory and, second, if not, to what extent the Forest Service is required to ensure old growth species viability.

As to the first question, the Forest Plan tasks the Forest Service to "[m]aintain and recruit old growth forests to an amount and distribution that is within the 75% range around the median of historical range of variability. Where current conditions are below this amount, actively manage to recruit additional old growth." *Id.* This provision falls within the "Forest Plan Goals" section of Amendment 21. As such, it is not mandatory, but sets a goal for the Forest Service to work toward, recognizing current conditions may not meet these standards.[9] *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660-61 (9th Cir. 2009) (finding language

---

[8]     "Old growth" is defined in Amendment 21 as "a community of forest vegetation that has reached a late stage of plant succession." V2:44722.

[9]     Notably, the Forest Plan does not specify a time period for achievement for its listed goals. T8a:33115.

in a Forest Plan that is merely advisory or aspirational does not give rise to a mandatory rule).

As to the second question, Plaintiffs challenge the Forest Service's viability determination on the grounds that anything less than the 75 percent provided for under Amendment 21 is insufficient to ensure old growth species viability. *See* V2:44725 ("The 75 percent range around the median of the historical variability is assumed to provide an acceptable level of habitat."). Defendants contend the Project meets the applicable Amendment 21 old growth standards, which requires limiting actions to those that "maintain or restore old growth composition and structure consistent with native disturbance and succession regimes, or reduce risks to sustaining old growth composition and structure." T8a:33141. Defendants argue this standard is met because no treatment in old growth stands is proposed, existing old growth stands will continue to provide habitat, and harvest treatments will retain vigorous, healthy, fire-resistant, and longer-lived tree species to promote old growth. V2:44733-35; V3:45170-71.

"[S]pecies viability may be met by estimating and preserving habitat only where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate." *Or. Nat.*

*Resources Council Fund v. Goodman*, 505 F.3d 884, 890 (9th Cir. 2007) (emphasis
and internal quotation marks omitted) (finding the Forest Service violated NFMA
when it failed to adequately explain how it identified suitable fisher habitat). "A
habitat disturbance does not necessarily mean that a species' viability will be
threatened." *Ecology Ctr.*, 574 F.3d at 663.

Here, the Project's impact on old growth associated species is discussed
thoroughly in the EA, both generally in regards to wildlife and specifically in
regards to old growth habitat. *See* V2:44632-841 (Chapter 3 of the EA,
"Wildlife"). In regards to the fisher, the EA discusses relative importance and
required levels of canopy cover, as well as the importance of snag density and the
effect of 320 acres of proposed treatment adjacent to riparian habitat. V2:44700-
702. The EA also notes the fisher is difficult to monitor, but available information
indicates adequate old growth, riparian habitat will remain under the Project.
V2:44703-703. The EA also states that approximately 250-500 acres of old growth
is required for the marten, V2:44726, and the average patch size in the immediate
Project area is 77 acres, with patches ranging from 20-272 acres, V2:44726.
Similarly, the Forest Service found goshawks inhabit forests with relatively closed
forest canopies (50-90 percent), and nests in Montana are often located near older
stands, near widely-spaced trees with water and large forest openings within 0.3

36

miles of the nest, V2:44727, and the Project will impact only 92 acres of goshawk post-fledgling habitat, V2:44733. The Forest Service also analyzed lynx and lynx critical habitat needs in this context, X20:59432, finding over 12,000 acres of Wilderness remain unaffected in the Project area, and a mosaic of forest stand conditions will continue to exist, V2:44677. Having adequately discussed the quality and quantity of both existing and necessary habitat for old growth associated species, the Forest Service has complied with the Forest Plan and, therefore, NFMA.

### D. Lynx

The Canada lynx is a threatened species under the ESA. 65 Fed. Reg. 16052, 16082 (Mar. 24, 2000). The Project area includes six Lynx Analysis Units ("LAUs"): Buck, Elk, Glacier, Holland, Lower Beaver, and Upper Beaver. V2:44658-59. In the Amended Biological Assessment, the Forest Service determined the Project was likely to adversely affect designated critical habitat for lynx. X20:59389. The Forest Service initiated formal consultation with the Fish and Wildlife Service under Section 7 of the ESA. This process culminated in the Fish and Wildlife Service concluding the Project would not likely adversely modify or destroy lynx critical habitat. G2:2552; X47:60948. Plaintiffs insist the Project be enjoined because the agencies must reinitiate and complete reconsultation on the

Lynx Direction, the Forest Service failed to adequately discuss "recovery," and the Forest Service failed to prepare a site-specific biological opinion for the Project.

### 1. The agency does not have to engage in reconsultation.

Plaintiffs complain the agencies must reinitiate and complete reconsultation on the Lynx Direction before allowing additional logging in lynx critical habitat. In making this point, Plaintiffs rely on *Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 1000 (D. Mont. 2013) and *Alliance for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1200 (D. Mont. 2013). These cases found an agency cannot meet its burden of showing an action will not jeopardize lynx or destroy or adversely modify its critical habitat by relying solely on the Project's compliance with standards and guidelines derived from the Lynx Direction because the Lynx Direction did not address lynx critical habitat. However, agencies "might be able to meet their burden by showing that the Project[] will have no adverse effects on the primary constituent elements of lynx critical habitat, without regard to compliance with any standards in the Lynx [Direction]." *Krueger*, 950 F. Supp. 2d at 1203; *Native Ecosystem Council v. Krueger*, CV 13-167-M-DLC, Doc. 34 at 20 (D. Mont. June 4, 2014).

Defendants aver the agencies expressly did not rely on the Lynx Direction, but used primary constituent elements ("PCEs") directly from the lynx critical

habitat rule. In a letter dated December 2, 2013, and attached to the Amended Biological Assessment prepared in this matter, the Forest Service informed the Fish and Wildlife Service: "Additional detailed analysis was done to ensure that the determination for lynx critical habitat did not rely on [the Lynx Direction]." X20:59386. Rather, the agency's analysis of lynx critical habitat is based on the four components for lynx critical habitat under the PCEs, which are the physical and biological features essential to the survival and recovery of lynx; these include: "[b]oreal forest landscapes supporting a mosaic of differing successional forest stages" that contain "presence of snowshoe hares and their preferred habitat conditions" (PCE 1a), appropriate snow conditions (PCE 1b), denning sites (PCE 1c), and "matrix habitat" providing connectivity between denning and foraging sites (PCE 1d). X20:59432. The Forest Service concluded sub-elements (b) and (d) would not be affected by the Project, a small amount of forage habitat decrease will result under (a), and the impact to denning under (c) would be insignificant. X47:60943-45. As the record contains a reasonable independent basis for the agencies' conclusions with respect to lynx critical habitat and does not rely solely on the Lynx Direction, the agencies' determination is upheld. Reconsultation is therefore not necessary before the Project can proceed.

## 2. The agency adequately addressed lynx recovery.

39

Plaintiffs further insist the Biological Opinion fails to adequately address the impact of the Project on lynx recovery. An agency must consider a proposed action's impact on both recovery and survival of a species in its jeopardy analysis. *Natl. Wildlife Fedn. v. Natl. Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2007); *Gifford Pinochet Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004). The Ninth Circuit has recognized, however, that survival and recovery are "generally considered together in analyzing effects, and it is difficult to draw clear-cut distinctions." *Natl. Wildlife Fedn.*, 524 F.3d at 932 n. 11 (quoting 51 Fed. Reg. 19,934 (June 3, 1986)); *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 443 (9th Cir. 2011) (noting recovery need not be addressed in a separate, distinct section of the biological opinion). That said, the Ninth Circuit has cautioned "the agency may not . . . ignor[e] recovery needs and focus[] entirely on survival[.]" *Natl. Wildlife Fedn.*, 524 F.3d at 932 n. 11.

Here, the biological opinion includes only one reference to "recovery," and it is in the context of the Lynx Direction. It asserts that the Lynx Direction "promotes and conserves the habitat conditions needed to produce snowshoe hare (lynx primary prey) densities that are adequate to sustain lynx within their home ranges, and thus sustain lynx populations and promote recovery of Canada lynx." X47:60941. Defendants ask the Court to look to substance over form, contending

40

that although the biological opinion does not use the word "recovery," it discusses lynx recovery in the context of "conservation" and continual support of the lynx. The biological opinion discusses "regeneration treatment" to provide "snowshoe hare habitat in the long-term." X47:60945. The analysis further addresses the concerns contained in the PCEs, such as deep and fluffy snow conditions and ensuring adequate denning habitat. *Id.* It concludes the "LAUs are expected to remain capable of producing adequate densities of snowshoe hares to support continual lynx presence and would continue to serve their intended conservation role for lynx. The physical and biological features would not be altered to an extent that would appreciably reduce the conservation value of critical habitat for lynx and the PCE would continue to function." *Id.* Although the cited portions of the biological opinion do not mention the word "recovery," they focus on conservation of the species. *See* 16 U.S.C. § 1532(3) (defining "conservation" as "all methods and procedures which are necessary to bring an endangered species or threatened species to the point at which measures [under the ESA] are no longer necessary"). A fair reading of the biological opinion, coupled with the deference due the agency, leads to the conclusion the agency adequately considered the impact the Project could have on the habitat's value for lynx recovery.

> **3.  The agency is not required to prepare a site-specific biological opinion**

41

The ESA's implementing regulations explain "formal consultation is required" if "any [agency] action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Plaintiffs contend agencies cannot abdicate their legal obligation to prepare a site-specific biological opinion on lynx jeopardy by referencing the programmatic biological opinion for the Lynx Direction. Defendants insist programmatic biological opinions comply with the requirements of § 402.14(h) by providing the required consultation for specific categories of agency action, particularly action that may affect a species over an entire region over several years. Defendants argue where the adverse effects of project activities fall entirely within the scope of previous analysis—as they claim is the case here—the agencies have fully complied with § 402.14(a).

Here, the Fish and Wildlife Service found "[t]he effects of the proposed action on Canada lynx fall within the range of effects analyzed in [its] first-tier biological opinion." X47:60933. The first-tier biological opinion in this case was prepared for the Lynx Direction. H133:10468-522. Based on that finding, the Fish and Wildlife Service concluded "no second-tier biological opinion is required for this project." X47:60933. According to the agency, "[s]econd-tier biological opinions would be issued as appropriate, where proposed actions would result in adverse effects to lynx that were not fully analyzed in the first-tier biological

42

opinion." X47:60932. The Fish and Wildlife Service found the effects to lynx

were adequately analyzed in the first-tier opinion because:

> 1) the proposed site-specific project falls within the scope of the first-tier biological opinion; 2) the effects of the proposed action are consistent with those anticipated and analyzed in the first-tier biological opinion, regarding fuels reduction treatments in the [wildland urban interface] WUI that result in snowshoe hare habitat degradation; and 3) the proposed action adheres to the appropriate terms and conditions associated with the reasonable and prudent measures identified in the first-tier biological opinion.

X47:60933.

In *Gifford*, the Ninth Circuit held an agency can at least partially rely on a

programmatic biological opinion in its jeopardy analysis. 378 F.3d at 1068.

However, the court specifically noted the agency there had conducted independent

analysis of site-specific data in the form of project-specific biological opinions that

supplemented the programmatic environmental analysis. *Id.* at 1067-68. Here, the

record shows the Forest Service drafted an amended biological assessment

specifically targeted at lynx and lynx habitat, engaging directly with the topic of

lynx critical habitat. X47:60935-49. In doing so, neither the Forest Service nor the

Fish and Wildlife Service ignored the effects the Project might have on lynx or

lynx critical habitat. Specifically, the Fish and Wildlife Service noted site-specific

information in its letter of concurrence:

> The proposed action will treat approximately 337 acres of stand
> initiation lynx habitat using the exemptions from amendment standard
> VEG S5 to thin conifers in the WUI for fuels reduction. An additional
> 43 acres of multistory lynx foraging habitat within the WUI would also
> be treated as part of the fuels reduction using the exemptions from
> standard VEG S6. When these 380 acres are added to the existing acres
> treated on the Forest through exemptions, the total amount is well within
> the six percent (103,800 acres) anticipated for the Forest and analyzed
> in the first tier opinion and incidental take statement. Since 2007 to
> date, the total acreage of lynx habitat treated or proposed to be treated
> to date in the WUI where exemptions to the standards are applied
> through Forest decisions, including the proposed action, is 4,081 acres;
> also well within the 103,800 total acres anticipated for the Forest.

X47:60933. When considered in conjunction with the site-specific information and

analysis included in the amended biological assessment, Plaintiffs have failed to

show the agencies' analysis is flawed or the agency failed to consider an important

aspect of the problem. *See Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F.

Supp. 2d 1199, 1210 (D. Mont. 2012) (holding the Forest Service met is

consultation requirements under ESA § 7(a)(2) where, in addition to relying on the

Lynx Direction Biological Opinion, it drafted a biological assessment and

thoroughly considered the project's impact on lynx and lynx critical habitat); *cf.*

*Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994)

(holding under NEPA, "[a] comprehensive programmatic impact statement

generally obviates the need for a subsequent site-specific or project-specific impact

statement, unless new and significant environmental impacts arise that were not

previously considered").

**E.     The Forest Service's decision not to prepare an EIS was not arbitrary or capricious.**

NEPA mandates federal agencies prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. If, in view of the EA, the agency concludes the project will have a significant effect on the environment, the agency must prepare an EIS. 40 C.F.R. § 1501.4. If, on the other hand, the agency makes a finding of no significant impact and does not prepare an EIS, it must "supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotation marks omitted). To prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, plaintiffs need not show significant effects will in fact occur. *Save the Yaak Comm.*, 840 F.2d at 717. Plaintiffs need only raise substantial questions whether a project may have a significant effect on the environment. *Id.*

Whether there may be a significant effect on the environment requires

consideration of two broad factors: context and intensity. *Ctr. for Biological Diversity v. Natl. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008); 40 C.F.R. § 1508.27. "Context" refers to the setting in which the proposed action takes place, 40 C.F.R. § 1509.27(a), which in this case is the Flathead National Forest. "Intensity . . . refers to the severity of the impact." *Id.* at § 1509.27(b). In considering the severity of the potential environmental impact, a reviewing agency may consider up to ten factors that help inform the "significance" of a project, such as the unique characteristics of the geographic area, including proximity to an ecologically sensitive area; the degree to which the effects on the quality of the human environment are likely to be highly controversial; whether the action bears some relationship to other actions with individually insignificant but cumulatively significant impacts; the level of uncertainty of the risk and to what degree it involves unique or unknown risks; the degree to which the action may adversely affect an endangered or threatened species or its habitat; and whether the action threatens violation of an environmental law. *Id.* at § 1508.27(b)(3), (4), (5), (7), (9), and (10). The Ninth Circuit has held the presence of one of these factors alone may be sufficient to require preparation of an EIS in appropriate circumstances. *Ocean Advocates v. U.S. Army Corps of Engrs.*, 402 F.3d 846, 865 (9th Cir. 2005).

An agency's decision not to prepare an EIS is governed by an arbitrary and

capricious standard, which "requires [the Court] to ensure that an agency has taken the requisite 'hard look' at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (citation and internal quotation marks omitted). The Ninth Circuit has repeatedly held the failure to consider crucial factors, the consideration of which are essential to a truly informed decision as to whether or not to prepare an EIS, is determinative. *Compare Found. for N. Am. Wild Sheep v. U.S. Dept. of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (holding the agency's decision not to prepare an EIS was unreasonable because it did not consider the amount of traffic that would occur on the newly-opened road or how that traffic would affect wild sheep) *with Greenpeace Action*, 14 F.3d at 1333 (holding the agency's decision not to prepare an EIS was not arbitrary and capricious because it considered the crucial factors surrounding the effect of pollock depletions on the Steller sea lion).[10]

Plaintiffs contend the Forest Service abused its discretion by not preparing an EIS for the Project. Specifically, Plaintiffs argue the Project will adversely

---

[10] As made clear in *Greenpeace Action*, the "reasonableness" standard applied in *Wild Sheep* is no longer the standard for reviewing an agency's determination not to prepare an EIS. *Greenpeace Action*, 14 F.3d at 1331.

affect lynx and lynx critical habitat, includes wetlands that are ecologically critical

for the ESA-listed water howellia, and will have potentially significant cumulative

effects. In contrast, Defendants assert the Forest Service's finding of no significant

impact was not arbitrary or capricious because it is based on information provided

by its scientific experts and the EA considered cumulative effects of other actions.

Ultimately, the record in this case reveals the Forest Service considered the crucial

factors here, taking the requisite "hard look" at the environmental consequences of

the proposed action. Therefore, its decision not to prepare an EIS is not arbitrary

and capricious.

### 1. Lynx and Lynx Critical Habitat

In the Amended Biological Assessment, the Forest Service reached a "may

affect - likely to adversely affect" conclusion for Canada lynx. X20:59430. This

was based on the fact that the Project "would decrease snowshoe hare habitat in

designated lynx habitat and in Canada lynx Critical Habitat by 380 acres."

X20:59438. The Forest Service found, however, the effects of the Project would

not be significant under NEPA because "[d]isturbance will be short term" and

"[p]otential disturbance of lynx will be mitigated by project Design Features to

reduce disturbance and displacement of grizzly bears." V3:77947. Similarly, a

"may affect, likely to adversely affect" determination was made for lynx critical

habitat. V3:44948. The Forest Service found this did not amount to a significant effect due to the "small scale" and "resulting low severity of effects." *Id.* Standing alone, these findings may suggest the need for an EIS. *Ocean Advocates*, 402 F.3d at 865. However, the Ninth Circuit has declined to interpret NEPA as "requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

The Forest Service adequately considered those factors crucial to lynx and lynx critical habitat. The Amended Biological Assessment and the EA both state: "There would be no significant large-scale (across the 6 LAUs) negative cumulative effects on Canada lynx or Canada lynx critical habitat as a result of implementing the . . . Project" because the proposed activities comply with the standards and guidelines of the Lynx Direction, extensive roadless and wilderness habitat remains, and a mosaic of forest stand conditions and successional stages would continue to exist. V2:44677; X20:49423. In summary the Amended Biological Assessment found:

> Within lynx Critical Habitat in the Glacier Loon area, there would be a decrease of approximately 380 acres that currently provide conditions for PCE1a (337 acres of stand initiation and 43 acres of multistory) . . . . PCE1a would be decreased by approximately 3% in the Glacier LAU, 0.2% in the Elk LAU, and 0.1% in the Lower Beaver LAU. The total

> decrease in lynx forage would represent approximately 0.009% of
> estimating existing lynx forage (PCE1a) in Critical Habitat within the
> combined area of the project LAUs.

X20:59434. The Assessment further states that the 87 acres of denning habitat that

would be affected "make up about 0.003% of the available denning habitat

(PCE1c) in the 6 project LAUs and less than 0.000003% of the Critical Habitat

area in Unit 3." X20:59435.

### 2. Water Howellia

Plaintiffs insist the Project includes wetlands that are ecologically critical to

water howellia. (Doc. 22 at 34 (citing V2:44513).) The portion of the record cited

by Plaintiffs does not support this assertion. Although the record indicates there

are wetlands and ponds with water howellia in the Project area, V2:44515, it does

not state these wetlands are "ecologically critical" to howellia populations. In their

reply, Plaintiffs seem to step back from this argument and assert that because the

EA clearly states effects to a single pond could have cumulative effects population-

wide, V2:44513, an EIS is necessary. Although mitigation measures may not be

used to bolster a finding of "no effect"—as is discussed above—proposed

mitigation measures may be considered in determining whether the preparation of

an EIS is necessary. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976,

987 (9th Cir. 1985). The Forest Service found through mitigation measures, such

as the use of a 300-foot buffer, water howellia would be protected from disturbing activity. V2:44520, J3:16431; J1:16391. The Forest Service also considered the location of the ponds, where existing roads lay, and how best management practices could be used to prevent further sedimentation and any other negative effects to water howellia. V2:44521, J1:16393.

Plaintiffs also cite the concerns raised by local county officials regarding the water howellia. E5:2078. A substantial public controversy exists as to the conclusions of an EA if a wide range of knowledgeable individuals are highly critical of it and its conclusions. *Greenpeace Action*, 14 F.3d at 1334. The commentary highlighted by Plaintiffs does not rise to this level. Plaintiffs fail to show what crucial factors, if any, were overlooked.

### 3.      Cumulative Effects

Plaintiffs further challenge the cumulative effects analysis under the EA, contending it fails to address numerous commercial logging projects in the area. Plaintiffs specifically reference five projects: Fredwood, Two Bear, Last Gap, Barber Chair, and Beaver Highway. Fredwood was specifically mentioned in the EA. V2:44424. Two Bear and Last Gasp were considered in a Supplemental Information Report ("SIR"). X46:60914-16; X20:59407, 59422. Plaintiffs contend the Barber Chair and Beaver Highway projects were never analyzed.

Contrary to Plaintiffs' claim, the Forest Service was permitted to analyze the cumulative effects of the three previously-implemented projects by The Nature Conservancy on the basis of the aggregate effects they manifested in the current condition of the land. *League of Wilderness Defenders v. Allen*, 615 F.3d 1122, 1136 (9th Cir. 2010). The EA discusses these past timber projects in the cumulative effects section, V2:44654, 44664, 44674, and cross references the cumulative effects worksheets addressing past private and Legacy Lands harvests, V2:44637; U14; U16. The EA also specifically addresses the impacts to certain species across unique geographic areas used to analyze those species, such as LAUs and Bear Management Subunits. *See Friends of the Wild Swan v. Weber*, Slip Copy No. 13-35817 at 12-13 (9th Cir. Sept. 24, 2014) (affirming the denial of a preliminary injunction on the grounds that the plaintiff failed to demonstrate that the Forest Service acted arbitrarily and capriciously in delineating the geographic boundaries of its cumulative analysis).

**F.     Plaintiffs voluntarily withdraw and waive their claim that the Project did not sufficiently analyze harm to elk.**

Plaintiffs have voluntarily withdrawn and waived their claim regarding the analysis of elk under the Project. (Doc. 33 at 48.) Summary judgment is granted in favor of Defendants as to this issue.

52

## III.   Plaintiffs' Motion to Supplement

Plaintiffs move to have the administrative record in this matter supplemented with: (1) a complete copy of the Agreed Operating Procedures, including the Fiber Supply Agreement; (2) the Forest Service's official Wolverine Guidance; and (3) two peer-reviewed articles addressing fuel-reduction.  Consideration of these materials is not necessary to reach a decision as to the parties' motions for summary judgment.

"Generally, judicial review of an agency decision is limited to the administrative record on which the agency based the challenged decision." *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).  The Ninth Circuit has outlined four narrow circumstances under which expansion of the administrative record may be allowed: "(1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency." *Id.* (citing *Lands Council v. Powell*, 393 F.3d 1019, 1030 (9th Cir. 2005)).  "These limited exceptions operate to identify and plug holes in the administrative record," *Lands Council*, 395 F.3d at 1030, so the plaintiff has a heavy burden to show "that the additional materials sought are necessary to

adequately review the [agency]'s decision," *Creek Cattle Co.*, 602 F.3d at 1131.

In regards to the Wolverine Guidance and the two peer-reviewed articles, the Forest Service did not rely on them in reaching its decision, and Plaintiffs have failed to show any of the four grounds mentioned above apply. Therefore, including them in the record is inappropriate. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) ("[P]ost-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." (internal quotation marks and alterations omitted)). This leaves only the Fiber Supply Agreement.

As the Fiber Supply Agreement is between The Nature Conservancy and Plum Creek, Plaintiffs have failed to show how its contents are necessary to adequately review the Forest Service's decision.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the motions for summary judgment (Docs. 20 and 28) are GRANTED IN PART and DENIED IN PART. Summary judgment is granted in favor of Plaintiffs on their claims: (1) the promulgation of the Agreed Operating Procedures and site-specific logging projects require analysis under NEPA and the ESA; (2) the agency's "no effect" determination for bull trout and water howellia is arbitrary and capricious; (3) the

agencies violated the ESA when they failed to follow the necessary procedures after reaching a "may affect" conclusion for the wolverine; and (4) the numerical objectives under Amendment 19 apply to predominantly National Forest System lands even if they are subject to reserved logging rights. Summary judgment is granted in favor of Defendants on all of Plaintiffs' other claims.

The matter is remanded to the agencies to perform the necessary analysis and follow the necessary procedures under the ESA for water howellia, bull trout, and wolverine and to reassess its Section 7 analysis regarding the grizzly bear in light of the application of the correct access objective under Amendment 19.

IT IS FURTHER ORDERED that Defendants are enjoined from implementing the Glacier Project while the proceedings required on remand are pending. Defendants are also enjoined from proceeding under the Agreed Operating Procedures until the necessary analysis has been performed.

IT IS FURTHER ORDERED that Plaintiffs' motion to supplement the record (Doc. 14) is DENIED.

The Clerk of Court is directed to enter judgment and close this case.

Dated this 25th day of September, 2014.

14:02 PM

Donald W. Molloy, District Judge
United States District Court

55