Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| SWAN VIEW COALITION, FRIENDS OF THE WILD SWAN, NATIVE ECOSYSTEMS COUNCIL, and ALLIANCE FOR THE WILD ROCKIES<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>CHIP WEBER, Flathead National Forest Supervisor, FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATE FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior,<br><br>　　　　　Defendants. | CV- 13-129-M-DWM<br><br><br>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE GLACIER LOON PROJECT INJUNCTION |

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  RESPONSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  This Court should decline to dissolve the injunction because the "not likely to adversely affect" conclusion for grizzly bears is arbitrary and capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  This Court should decline to dissolve the injunction because the Forest Service has not yet disclosed, applied, and demonstrated compliance with the correct Amendment 19  numerical objectives in a NEPA analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.  This Court should decline to dissolve the injunction until the agencies complete reconsultation on the Lynx Amendment, as recently required by a July 2015 Ninth Circuit decision. . . . . . . . . . . . . . . . . . . . . . . 18

    D.  This Court should decline to dissolve the injunction because the agencies have not yet reinitiated or completed reconsultation on Amendment 19 to address the changes in land ownership resulting from the Legacy Lands acquisition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TABLE OF AUTHORITIES

CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). . . . . . . . 22

*Alliance for the Wild Rockies v. Weldon,*

   2011 WL 3348000 (D. Mont. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

*California. v. Block,* 690 F.2d 753 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . 18

*Cottonwood Environmental Law Ctr. v. USFS,*

   789 F.3d 1075 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Friends of Wild Swan v. USFS,* 2013 WL 1295339 (D. Mont. 2013). . . . . . . . . . . 27

*Idaho Sporting Congress v. Alexander,* 222 F.3d 562 (9th Cir.2000). . . . . . passim

*Lane Cnty. Audubon Society v. Jamison,* 958 F.2d 290 (9th Cir. 1992). . . . . . 21, 27

*League of Wilderness Defenders v. Connaughton,* 752 F.3d 755 (9th Cir.2014). . 17

*Northern Plains Res.Council, Incorporated v. Surface Transportation Board,*

   668 F.3d 1067 (9th Cir.2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Native Ecosystems Council v. Krueger*, 946 F.Supp.2d 1060 (D. Mont. 2013). . . 20

*Native Ecosystems Council v. Krueger,* 2015 WL 5164994 (D.Mont 2015). . . . . 27

*Native Ecosystems Council v. USFS,* 418 F.3d 953 (9th Cir.2005). . . . . . . 9, 10, 16

*N.C. Wildlife Federation v. NCDOT,* 677 F.3d 596,598 (4th Cir.2012). . . . . . . . . 17

*Olympic Forest Coalition v. USFS,*

    556 F.Supp.2d 1198 (W.D.Wash. 2008). . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 18

*Oregon Natural Resource Council  v. USFS,*

    293 F.Supp.2d 1200 (D.Or. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Pacific Rivers Council v. Thomas,* 30 F.3d 1050 (9th Cir.1994). . . . . . . 20, 21, 27

*Swan View Coalition v. Barbouletos,*

    2008 WL 5682094 (D. Mont. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

STATUTES

16 U.S.C. § 1532(19). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1536(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27

16 U.S.C. §1604(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

REGULATIONS

36 C.F.R. §219.139(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

40 C.F.R. §1502.16.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

50 C.F.R. §17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

50 C.F.R. §402.16(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## I.  INTRODUCTION

On September 25, 2014, this Court issued an injunction against implementation of a logging and road-building project on the Flathead National Forest called the Glacier Loon Project.  *Swan View Coalition. v. Weber*, 52 F.Supp.3d 1133,1160 (D.Mont. 2014).  The Project would allow hundreds of acres of commercial logging and over 20 miles of temporary road construction or road re-opening in habitat for species listed under the Endangered Species Act (ESA), including the threatened grizzly bear and threatened lynx.  FS-044927, 044935, 060091.  On September 25, 2015, Defendants (agencies) filed a motion to dissolve the Court's injunction so that logging and road-building and re-opening may proceed.  Doc. 86. For the reasons discussed below, and in all prior briefing, Plaintiffs (collectively "Coalition") respectfully request that the Court deny the agencies' motion.

## II.  RESPONSE

**A.  This Court should decline to dissolve the injunction because the "not likely to adversely affect" conclusion for grizzly bears is arbitrary and capricious.**

In USFS's revised biological assessment addressing the impact of the Project on grizzly bears, USFS reaches a conclusion that "[t]he determination for grizzly bear due to the effects of the Glacier Loon [] Project is MAY AFFECT, NOT

1

LIKELY TO ADVERSELY AFFECT." Doc. 87-6 at 3.  This is the same

conclusion USFS reaches in its initial biological assessment. FS-0044945.  This

Court has not yet ruled on whether the agencies' "not likely to adversely affect"

conclusion is arbitrary and capricious. *Weber*, 52 F.Supp.3d at 1151.  As set forth

below, USFS's conclusion is arbitrary and capricious because it ignores the

definitions of "not likely to adversely affect" and "likely to adversely affect."

Application of these definitions require a conclusion that the effects of the Project

are likely to adversely affect grizzly bears because (1) the Project will cause

measurable reductions in hiding cover, forage, and security; (2) the Project will

temporarily increase adverse effects above existing baseline levels; and (3)

purported long-term net benefit does not allow USFS to disregard short-term

adverse effects.

The ESA Section 7 Handbook provides the definitions for the terms "likely to

adversely affect" and "not likely to adversely affect:"

> **Is likely to adversely affect** - the appropriate finding in a biological
> assessment (or conclusion during informal consultation) if any adverse
> effect to listed species may occur as a direct or indirect result of the
> proposed action or its interrelated or interdependent actions, and the
> effect is not: discountable, insignificant, or beneficial (see definition of
> "is not likely to adversely affect"). In the event the overall effect of the
> proposed action is beneficial to the listed species, but is also likely to
> cause some adverse effects, then the proposed action "is likely to
> adversely affect" the listed species. If incidental take is anticipated to

2

occur as a result of the proposed action, an "is likely to adversely affect" determination should be made.  An "is likely to adversely affect" determination requires the initiation of formal section 7 consultation. [Clarification of usage]

. . .

**Is not likely to adversely affect** - the appropriate conclusion when effects on listed species are expected to be discountable, insignificant, or completely beneficial. Beneficial effects are contemporaneous positive effects without any adverse effects to the species. Insignificant effects relate to the size of the impact and should never reach the scale where take occurs. Discountable effects are those extremely unlikely to occur. Based on best judgment, a person would not: (1) be able to meaningfully measure, detect, or evaluate insignificant effects; or (2) expect discountable effects to occur. [Clarification of usage]

Doc. 87-12 at xv-xvi.

The Handbook further clarifies that a not likely to adversely affect "finding can be made only if ALL of the reasonably expected effects of the proposed action will be beneficial, insignificant, or discountable."  Doc. 87-12 at 4-1 (emphasis in original).  Additionally, "[i]n the event the overall effect of the proposed action is beneficial to the listed species or critical habitat, but may also cause some adverse effect on individuals of the listed species or segments of the critical habitat, then the determination should be 'is likely to adversely affect.'" Doc. 87-12 at B-56.

In this case, USFS admits that "[b]ased on current knowledge of the life history, biology, and ecology of grizzly bear, certain elements are thought to be

3

essential to the conservation of the species. These elements include [1] adequate amounts of denning and forage habitat, [2] adequate hiding cover, and [3] a level of security within their territory that provides for a low risk of displacement or mortality." Doc. 87-6. All three of these "essential" elements will be degraded and measurably reduced during Project implementation. Regarding denning and forage habitat, the Project will reduce important foraging habitat on 320 acres for up to five years. Doc. 87-6 at 12. Regarding hiding cover, the Project will reduce hiding cover on 1,042 acres for 10-20 years. Doc. 87-6 at 12-13.

Regarding security, the Project will increase both open and total road densities during the Project. The Project allows for the temporary reopening and use of 16.0 miles of closed roads and the construction and use of 5.9 miles of new roads during the Project. Doc. 87-6 at13,14. During the Project, these new and reopened roads will (1) increase total road density in the Glacier Loon subunit from 43% to 46%; (2) increase open road density in the Glacier Loon subunit from 22% to 38%; and (3) increase open road density in the Buck Holland subunit from 24% to 25%. Doc. 87-6 at 21.

In order to reach a "not likely to adversely affect" conclusion, USFS must establish that all effects of the action are beneficial, discountable, or insignificant. Doc. 87-12 at xv-xvi. "Discountable" means "extremely unlikely to occur." *Id.*

4

Logging and road construction and reopening must occur in order to implement the Project, thus these activities are not "extremely unlikely to occur," and therefore they are not "discountable" under the definition of that term in the Handbook.  Doc. 87-12 at xv-xvi.

Moreover, an effect is only "insignificant" under the Handbook if an individual would not "be able to meaningfully measure, detect, or evaluate" it.  *Id.* The Project will cause measurable, detectable reductions in forage, hiding cover, and security during the Project – including a 320 acre reduction in forage, a 1,042 acre reduction in hiding cover, and a 16% increase in open road density in the Glacier Loon subunit, as noted above – therefore the effects of the Project are not "insignificant" under the definition of that term in the Handbook.  Doc. 87-12 at xv-xvi.  Accordingly, because the negative effects of this Project on grizzly bears are not "discountable" or "insignificant" as those terms are defined, this Project is likely to adversely affect grizzly bears.  Doc. 87-12 at xv-xvi.  The agencies' conclusion to the contrary is arbitrary and capricious because they fail to apply the definitions of these terms of art.[1]

---

[1]USFS is aware that these terms have specific definitions, as demonstrated by the fact that it applies these definitions of "insignificant" and "discountable" in its revised biological assessment for water howellia:  "It is my determination that the Glacier Loon project may affect but not likely to adversely affect water howellia. . . . If there were to be any effects from road activities and associated best management

Moreover, USFS now admits that the baseline road density conditions in the Glacier Loon subunit and Buck Holland subunit are causing "take" of grizzly bears in the form of "harm" under the ESA.  Doc. 87-6 at 22; *see* 16 U.S.C. § 1532(19)(defining take to include harm); 50 C.F.R. §17.3 (defining harm).  The scientific threshold for take in this form is no more than 19% open road density over 1 mi./sq. mi., no more than 19% total road density over 2 mi./sq. mi., and no less than 68% core habitat (referred to as 19/19/68).  *See Weber*, 52 F.Supp.3d at 1148 n.6, 1150.  Both subunits in the Project area fail all three parameters:  the condition in Glacier Loon subunit is 22/43/40 and the condition in Buck Holland subunit is 24/41/41.  Doc. 87-6 at 21.

Regardless of whether incidental "take" is permitted or not, when a negative effect rises to the level of "take" under ESA Section 9, it automatically constitutes a *per se* "adverse effect" under ESA Section 7:  "If incidental take is anticipated to occur as a result of the proposed action, an 'is likely to adversely affect' determination should be made."   Doc. 87-12 at xv-xvi.  Thus, the baseline condition in the Project area is already likely to adversely affect grizzly bears.  *See id.*  The Forest Service admits this fact.  Doc. 87-6 at 3.

---

practices, they would be *insignificant as they would be immeasurable and not detectable*. In addition, any effects are *discountable as they are extremely unlikely to occur*." Doc. 87-2 at 19 (emphases added).

What USFS will not squarely acknowledge, however, is the fact that during the Project both open road density and total road density will increase further above the levels that are already causing adverse effects and take to grizzly bears. During the Project, new and reopened logging roads for the Project will (1) increase total road density in the Glacier Loon subunit from 43% to 46%; (2) increase open road density in the Glacier Loon subunit from 22% to 38%; and (3) increase open road density in the Buck Holland subunit from 24% to 25%. Doc. 87-6 at 21.

Because the Project increases road density above levels that are already causing Section 9 take and Section 7 adverse effects, the Project itself is causing additional Section 9 take and additional Section 7 adverse effects beyond the baseline habitat conditions. Regardless of whether the additional incidental take is permitted or not, a finding that a project will cause any incidental take necessitates a "likely to adversely affect" conclusion: "If incidental take is anticipated to occur as a result of the proposed action, an 'is likely to adversely affect' determination should be made." Doc. 87-12 at xv-xvi. The agencies do not clearly address this issue in reaching their "not likely to adversely affect" conclusion.

Furthermore, USFS admits that the Project will cause "negative effects to grizzly bear[s]." Doc. 87-6 at 14. However, USFS argues that there will only be "short-term displacement" and "short-term rather than long-term reductions in

7

hiding cover and forage." Doc. 87-6 at 26. Likewise, USFS argues that "[o]pen

road densities would increase temporarily during proposed activities, but there

would be no net increase in open road or total road density" and that post-Project,

the road densities would improve with a 0.1% reduction in road density in the Buck

Holland subunit and a 3% reduction in road density in the Glacier Loon subunit. *Id.*

     USFS's conclusion that these temporary negative effects do not necessitate a

"likely to adversely affect" conclusion, Doc. 87-6 at 25-26, ignores the definition of

that term. The Section 7 Handbook dictates that if there are temporary negative

effects, and a net positive effect, the appropriate conclusion in such a case is still

"likely to adversely affect:" "[i]n the event the overall effect of the proposed action

is beneficial to the listed species or critical habitat, but may also cause some adverse

effect on individuals of the listed species or segments of the critical habitat, then the

determination should be "is likely to adversely affect." Doc. 87-12 at B-56. In other

words, an agency may make a "not likely to adversely affect" conclusion "only if

ALL of the reasonably expected effects of the proposed action will be beneficial,

insignificant, or discountable." Doc. 87-12 at 4-1 (emphasis in Handbook).

Because this Project admittedly will cause temporary or short-term negative effects,

the conclusion must be "likely to adversely affect." *Id.*

     Finally, in making its "not likely to adversely affect" conclusion, the Forest

Service represents:  "The Glacier Loon Project is in accordance with . . . the

Flathead Forest Plan and amendments . . ."  Doc. 87-6 at 26.  This representation is

false.  The Decision Notice for Amendment 19 states:  "The Alternative 3-corrected

includes an amendment to Forest-wide General Standard No. 1 clarifying that

the *access density objectives of Amendment 19 are not discretionary*."  FS-

042867 (emphasis added).  These non-discretionary objectives require that within

five years, subunits with over 75% National Forest lands must obtain grizzly bear

security at the level of 19/24/60.  FS-042800.  Within ten years, subunits with over

75% National Forest lands must obtain grizzly bear security at levels of 19/19/68.

FS-042800.

The Legacy Lands transfer occurred in 2010, and created seven new subunits

with over 75% National Forest lands.  FS-61798.  It is now 2015.  Thus, for those

seven "Legacy Lands subunits," USFS had until this year to meet the non-

discretionary five year security objectives of 19/24/60.  FS-042800.  The Forest

Service has failed to meet these five-year non-discretionary objectives in the Project

area subunits, and it has failed to exercise its only other lawful option, which would

be the implementation of a Forest Plan amendment for the Project to amend

Amendment 19 with a different schedule for compliance for the Glacier Loon and

Buck Holland subunits.  *See Native Ecosystems Council v. USFS*, 418 F.3d 953,

961 (9th Cir.2005)(If USFS does not want to comply with its forest plan, it must "propose amendments to the [Forest] Plan altering its standards, in a process complying with NEPA and NFMA . . . ."). Under these circumstances, USFS's representation that it is complying with the Flathead Forest Plan and amendments is false, and cannot be lawfully relied upon to reach a "not likely to adversely affect" conclusion.

**B. This Court should decline to dissolve the injunction because the Forest Service has not yet disclosed, applied, and demonstrated compliance with the correct Amendment 19 numerical objectives in a NEPA analysis.**

NFMA requires USFS compliance with forest plan provisions. 16 U.S.C. §1604(i). Thus, "[i]t is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Council*, 418 F.3d at 961. Additionally, during NEPA analysis, agencies must address "[p]ossible conflicts between the proposed action and the objectives of Federal . . . land use plans . . . ." 40 C.F.R. §1502.16. The Forest Service's failure to demonstrate compliance with forest plan provisions violates NEPA's "hard look" requirement. *Council*, 418 F.3d. at 962-964.

The Ninth Circuit holds that if the Forest Service fails to apply a particular forest plan standard correctly in a project NEPA analysis, then USFS must prepare a supplemental environmental assessment or EIS applying the standard correctly; it

cannot simply prepare a supplemental information report:

> Here, the Forest Service is not using the [supplemental information reports] wholly for the purpose of evaluating the significance of new information or changed circumstances. []. Instead, the Forest Service is using the [supplemental information reports] to present information and analysis that it was required but . . . failed to include in its original NEPA documents. In *Cuddy Mountain,* we held that before approving a timber sale in the [Payette National Forest], the Forest Service is required (1) to ensure that after the sale at least 5% of the timber in each affected "home range" is old growth timber and that at least 2.5% is old growth habitat . . . These requirements are not "new" information; nor can their significance be questioned. Although *Cuddy Mountain* may have been decided after the Forest Service prepared its original [environmental assessments] and EISs for the timber sales at issue in this case, our decision did not create these requirements. They stem from NEPA, NFMA and the Forest Service's own [forest plan]. The Forest Service knew or should have known that it needed to provide this information and analysis at the time it prepared the original [environmental assessments] and EISs.
>
> It is inconsistent with NEPA for an agency to use a[] [supplemental information report] , rather than a supplemental [environmental assessment] or EIS, to correct this type of lapse.

*Idaho Sporting Congress v. Alexander*, 222 F.3d 562,566-67 (9th Cir.2000).

Likewise, in *Oregon Natural Resource Council  v. USFS*, a prior court decision had indicated that USFS was illegally exempting timber sales from certain forest plan provisions required by the Northwest Forest Plan.  293 F.Supp.2d 1200,1202 (D.Or. 2003).  After the court decision, the Forest Service prepared supplemental information reports documenting the post-hoc actions it had taken to

comply with the forest plan requirements for those timber sales. *Id.* "[T]he agency

[did] not prepare[] new or supplemental NEPA analyses to consider, analyze or

disclose its duties under the []standard . . . ." *Id.* at 1204. The court ultimately

held:

> The underlying [environmental assessments] for the timber sales at
> issue did not properly frame the Forest Service's survey and manage
> duties, they did not analyze a range of alternatives based upon these
> duties, . . . they did not demonstrate that the Forest Service had all of
> the proper information before it before allowing logging, and they did
> not provide for public influence over the decisions. For all of these
> reasons, the underlying [environmental assessments] are legally
> deficient. Under *Idaho Sporting Congress,* "[i]t is inconsistent with
> NEPA for an agency to use an [supplemental information report],
> rather than a supplemental [environmental assessment] or EIS, to
> correct this type of lapse." *Id.* I find that the Forest Service's use of
> [supplemental information reports] in this case violates NEPA.

*Id.* at 1209 (citations omitted).

Likewise, in *Olympic Forest Coalition v. USFS*, a prior court decision had

given notice to the Forest Service that it had applied the incorrect forest plan

objectives in an Olympic National Forest timber sale environmental assessment.

556 F.Supp.2d 1198,1202 (W.D.Wash.2008). Instead of applying the correct forest

plan objectives in a supplemental environmental assessment, USFS issued an

"Interested Party Letter" that was not subject to public comment, and asserted that

the timber sale was consistent with the correct forest plan objectives. *Id.* The court

12

ultimately held:

> the effect of the [intervening court] decision was to resurrect the laws
> developed and set out under the original [] Forest Plan, not to create
> new ones. . . . The Forest Service has never produced the [forest plan
> objectives] analyses required . . . . Moreover, the Forest Service does
> not persuasively argue that this analyses has ever been produced in a
> NEPA document, supplemental or otherwise. The Interested Party
> Letter was not open to public comment or subject to appeal. . . .
> Accordingly, following *Idaho Sporting Congress* and *ONRC*, the court
> finds that "it is inconsistent with NEPA for an agency to use a
> [supplemental information report], rather than a supplemental
> [environmental assessment] or EIS, to correct this type of lapse."

*Id.* at 1208 (citations omitted).

In its summary judgment opinion, this Court held that the numerical

objectives in Amendment 19 apply to the subunits in the Project area because those

subunits now have over 75% National Forest lands following the Legacy Lands

transfer to USFS. *Weber*, 52 F.Supp.3d at 1148. Thus, in the revised biological

assessment for the Project, the Forest Service admits that "under the Forest Plan as

it currently stands, the specific numerical objectives required for lands that are

predominantly National Forest System lands under Amendment 19 apply to the

Glacier Loon and Buck Holland subunits." Doc. 87-6 at 20. USFS further admits

that "[t]he existing conditions of neither the Buck Holland nor Glacier Loon grizzly

bear subunits meet the A19 objectives . . . . After project completion the Buck

Holland and Glacier Loon subunits would still not meet A19 numerical objectives .

13

. . .”  Doc. 87-6 at 21;  *see also* FWS admission at Doc. 87-7 at v (“Road densities

and security core do not meet the numerical objectives of A19 within the action

area”).

Although USFS made this admission in the revised biological assessment

submitted to this Court, the Environmental Assessment still misleadingly represents

the diametrically opposite conclusion to the public.  In the Environmental

Assessment for the Project, USFS  represents to the public that “[a]ll alternatives  . .

. *achieve A19 numerical objectives before and following implementation* of

proposed activities.”  FS-44657 (section entitled “Regulatory Framework and

Consistency:  Flathead Forest Plan/Amendment 19”)(emphasis added).  As noted

above, that public representation is false.  Doc. 87-6 at 21.  USFS refuses to prepare

a supplemental Environmental Assessment for the Project to (a) notify the public of

noncompliance with the Amendment 19 numeric objectives, (b) explain USFS’s

plan/schedule to comply with the Amendment 19 numeric objectives in the Project

area, and (c) reassess whether there is truly a reasonable range of alternatives for the

Project if none of the alternatives comply with Amendment 19 numeric objectives.

Instead of preparing a supplemental Environmental Assessment, USFS issued a

supplemental information report that asserts that “the previously disclosed

environmental effects remain valid and does [sic] not require a new analysis and

decision at this time." Doc. 87-8 at pdf-assigned page 2.

The Ninth Circuit's binding and well-established precedent in *Alexander* controls this case. In this case, USFS did not apply the Forest Plan Amendment 19 numeric objectives to the Project area in the Environmental Assessment. *See* Doc. 87-8 at 4. This Court's "decision did not create these requirements. They stem from NEPA, NFMA and the Forest Service's own [forest plan]. The Forest Service knew or should have known that it needed to provide this information and analysis at the time it prepared the original [environmental assessments]." *Alexander*, 222 F.3d at 566-67. After this Court issued a ruling that USFS had not applied the correct standard, *Weber*, 52 F.Supp.3d at 1148, USFS should have prepared a supplemental environmental assessment. "It is inconsistent with NEPA for an agency to use a[] [supplemental information report] , rather than a supplemental [environmental assessment], to correct this type of lapse." *Alexander*, 222 F.3d at 566-67. This procedural requirement is well-established; USFS is quite familiar with it; and USFS should have followed this procedural requirement as a matter of course in this case. *See id; see also Oregon Natural Resource Council,* 293 F.Supp.2d at 1209; *Olympic Forest Coalition,* 556 F. Supp. 2d 1208.

Moreover, as noted above, the numeric objectives of Amendment 19 are "not discretionary." FS-042867. Within five years, the affected subunits must reach the

19/24/60 objectives, and within ten years, the affected subunits must reach the

19/19/68. FS-042800. The Legacy Lands were transferred to USFS ownership in

2010 and it is now 2015. Thus, USFS must either publicly demonstrate compliance

with the five year objectives (19/24/60) at this point, or publicly amend the Forest

Plan in a manner that complies with NEPA and NFMA to set a different compliance

schedule for the Glacier Loon and Buck Holland subunits. *Council*, 418 F.3d at

961. An amendment to the Forest Plan would require a NEPA analysis, including

public notice and opportunities for public participation. 36 C.F.R. §219.139(b).

Although USFS has issued Project-specific Forest Plan amendments for other

Projects to excuse non-compliance with the Amendment 19 schedule, *see e.g.* FS-

0061831,[2] USFS has not yet issued any Forest Plan amendment to excuse

noncompliance with the five year objectives for the Glacier Loon and Buck Holland

subunits. USFS's failure to acknowledge and address noncompliance with

Amendment 19 objectives in the Project Environmental Assessment violates both

NFMA and NEPA. *Council*, 418 F.3d. at 961-964; 40 C.F.R. §1502.16; 16 U.S.C.

---

[2]USFS has "amended A[mendment] 19 management direction in six subunits to date . . . .[FWS] evaluated the amendments under section 7 consultations and concluded that the amendments would not result in jeopardy to grizzly bear (U.S. Fish and Wildlife Service 2004a, 2004b, 2002b). The six amended subunits include: Lower Whale, Werner Creek, Canyon McGinnis, Doris Lost Johnny, Wounded Buck Clayton, and Wheeler Quintonkon." FS-0061831.

§ 1604(i).

Simply acknowledging its own noncompliance with Forest Plan provisions in a post-hoc internal agency document sent to "Project Files," Doc. 87-8 (supplemental information report), or sent to another agency, Doc. 87-6 (biological assessment), does not satisfy USFS's legal obligations. *Alexander*, 222 F.3d at 566-67. "NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res.Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067,1072 (9th Cir.2011). Thus, "[i]nformed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA." *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755,761 (9th Cir.2014). If "the data is not available during the EIS process and is not available to the public for comment. . . . the EIS process cannot serve its larger informational role, and the public is deprived of their opportunity to play a role in the decision-making process." *N. Plains*, 668 F.3d at 1085. Moreover, if an agency mispresents information to the public in an EIS, the agency also frustrates the public participation purpose and violates NEPA. *N.C. Wildlife Fed'n v. NCDOT*, 677 F.3d 596,598 (4th Cir.2012). In this case, USFS has not yet disclosed to the public that the Amendment 19 numeric objectives apply to the Project area, and it has not yet

17

disclosed to the public how it plans to demonstrate compliance with Amendment 19 on the subunits affected by the Legacy Land exchange.  The public is entitled to this information.  USFS's attempt to insulate its decision-making process from public scrutiny frustrates a fundamental purpose of NEPA to guarantee meaningful public participation.  *See California. v. Block*, 690 F.2d 753, 771 (9th Cir. 1982).

This Project must remain enjoined until USFS has fully complied with its obligations under NEPA and NFMA.  *Alexander*, 222 F.3d at 566-67; *Oregon Natural Resource Council,* 293 F.Supp.2d at 1209; *Olympic Forest Coalition,* 556 F. Supp. 2d 1208.

**C.  This Court should decline to dissolve the injunction until the agencies complete reconsultation on the Lynx Amendment, as recently required by a July 2015 Ninth Circuit decision.**

In this Court's September 25, 2014 opinion, it held that "[t]he agency does not have to engage in reconsultation." *Swan View*, 52 F.Supp.3d at 1152.  Since that time, the Ninth Circuit has issued binding precedent to the contrary, requiring the agencies to complete ESA Section 7 reconsultation on the Lynx Amendment. *Cottonwood Envtl. Law Ctr. v. USFS.*, 789 F.3d 1075,1077-78 (9th Cir.2015).  ESA regulations mandate reinitiation of consultation under the following circumstances: "b) If new information reveals effects of the action that may affect . . . critical habitat in a manner or to an extent not previously considered" and "(d) If a new . . .

18

critical habitat [is] designated that may be affected by the identified action." 50

CFR §402.16.  In *Cottonwood*, the Ninth Circuit held that "[t]he 2009 revised

critical habitat designation clearly meets the requirements of subsections (b) and (d)

[]."  789 F.3d at 1086.

In *Cottonwood*, the Ninth Circuit further held that the agencies cannot avoid

consultation on the Lynx Amendment by relying upon site-specific project level

consultations because "project-specific consultations do not include a unit-wide

analysis comparable in scope and scale to consultation at the programmatic level."

789 F.3d at 1082.   Accordingly, in this case, even though the agencies did a

project-specific assessment of lynx critical habitat for this Project, that analysis is

insufficient to satisfy the agencies' obligations for reconsultation under the ESA.

*Cottonwood*, 789 F.3d at 1082.

Within lynx critical habitat, the Project will render unsuitable 1,282 acres of

lynx habitat.  FS-044937.  Lynx Amendment Standards VEG S5 and VEG S6

restrict the reduction of winter snowshoe hare habitat, FS-009795, FS-002865-2866,

but the Project allows logging that does not meet these standards, *id*.  In order to

authorize the Project, USFS relied upon a special exemption authorized in the Lynx

Amendment that exempts wildland urban interface areas from logging restrictions

intended to protect lynx.  FS-002865-002866.  Because the agencies have not yet

19

consulted on the impacts of the Lynx Amendment on lynx critical habitat on

National Forest lands, there is no programmatic analysis on how exempting wildland

urban interface areas on National Forest lands from these logging restrictions will

impact lynx critical habitat.  *See Cottonwood*, 789 F.3d at 1082.

Until reconsultation on the Lynx Amendment is complete, these activities in

lynx critical habitat must be enjoined.  This Court addressed a similar situation in

*Native Ecosystems Council v. Krueger*, a case in which the Forest Service had

reinitiated consultation on forest plan provisions addressing grizzly bears, yet USFS

still planned to proceed with activities that may have harmed grizzly bears during

the consultation.  946 F.Supp.2d 1060,1076 (D. Mont.2013).  This Court held:

> the Project must be enjoined until Defendants complete the reinitiated
> consultation for grizzly bears. . . . Section 7 provides that "[a]fter
> initiation of consultation required under subsection (a)(2) of this
> section, the Federal agency ... shall not make any irreversible or
> irretrievable commitment of resources with respect to the agency action
> which has the effect of foreclosing the formulation or implementation
> of any reasonable and prudent alternative measures which would not
> violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

*Id.*

It is well-established law that "timber sales constitute per se irreversible and

irretrievable commitments of resources under §7(d) . . . ."  *Pac. Rivers Council v.*

*Thomas*, 30 F.3d 1050,1057 (9th Cir.1994).  Thus, the law mandates that

"individual [timber] sales cannot go forward until the consultation process is complete on the underlying plans which [the agency] uses to drive their development." *Lane Cnty. Audubon Soc. v. Jamison*, 958 F.2d 290, 295 (9th Cir. 1992).

This binding Ninth Circuit precedent now applies to this case in light of the Ninth Circuit's holding that the agencies must reconsult on the Lynx Amendment. *Cottonwood*, 789 F.3d at 1086.  The Glacier Loon Project – a timber sale project that applies the Lynx Amendment to authorize hundreds of acres of logging that is within lynx critical habitat – "cannot go forward until the consultation process is complete on the underlying" Lynx Amendment.  *Lane Cnty,* 958 F.2d at 295 ; *Pac. Rivers*, 30 F.3d at 1057.

Furthermore, in *Cottonwood*, the Ninth Circuit held that in order to demonstrate that specific logging projects should be enjoined while Lynx Amendment consultation is pending, a plaintiff only needs to show that "specific projects will likely cause irreparable damage to its members' interests."   789 F.3d at 1092.   "In light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs." *Id.*

In this case, the Glacier Loon Project will likely cause irreparable damage to

21

the Coalitions' members' interests in looking for, observing, and studying lynx in

their undisturbed natural habitat in the Project area:

> The Glacier Loon Project, [and] Northern Rockies Lynx Management
> Direction . . . will irreparably harm the Alliance's members' interests in
> the naturally functioning ecosystems of the Forest and Project analysis
> areas, in particular their interests in looking for, viewing, studying, and
> enjoying . . . lynx . . . undisturbed in their natural surroundings. The
> challenged activities will prevent Alliance's members' use and
> enjoyment of the natural areas in the area in its undisturbed state for
> this purpose. The activities also . . . are occurring without adequate
> compliance and consultation under the Endangered Species Act, which
> represents irreparable harm to the species and to Alliance's rights under
> the law . . . .Logging, burning, road-building, road use, road
> reconstruction, etc constitute . . . irreparable harm . . . . These types of
> ecological and esthetic degradations will render the area unsuitable for
> our own esthetic, recreational, scientific, spiritual, vocational, and
> educational activities, which include wildlife observation and study,
> hiking, camping, and quiet contemplation in nature.

Declaration of Michael Garrity, Doc. 37-1 ¶¶4,6 (July 1, 2014).

This testimony satisfies the irreparable harm requirement under the test set

forth by the Ninth Circuit in *Alliance for the Wild Rockies v. Cottrell*:

> AWR asserts that its members' interests will be irreparably harmed by
> the Rat Creek Project. In particular, AWR asserts that the Project will
> harm its members' ability to "view, experience, and utilize" the areas
> in their undisturbed state. . . . The Project will prevent the use and
> enjoyment by AWR members of 1,652 acres of the forest. . . . actual
> and irreparable injury, such as AWR articulates here, satisfies the
> "likelihood of irreparable injury" requirement articulated in *Winter*.

632 F.3d 1127,1135 (9th Cir. 2011)(citation omitted); *see also Alliance for the*

*Wild Rockies v. Weldon*, 2011 WL 3348000 at *3 (D.Mont.2011)("The irreparable

injury to which Plaintiffs are exposed is the loss of use and enjoyment of forested

federal land due to logging").  Accordingly, an injunction is necessary in this case

under the new Ninth Circuit precedent in *Cottonwood*; therefore, dissolution would

be inappropriate at this time.

**D.  This Court should decline to dissolve the injunction because the agencies
have not yet reinitiated or completed reconsultation on Amendment 19 to
address the changes in land ownership resulting from the Legacy Lands
acquisition**.

Just as the Lynx Amendment biological opinion is no longer valid and

requires reconsultation, *Cottonwood*, 789 F.3d at 1086, the Amendment 19

biological opinion is also no longer valid and requires reconsultation.  "Reinitiation

of formal consultation is required . . . [i]f new information reveals effects of the

action that may affect listed species or critical habitat in a manner or to an extent not

previously considered. . . ."  50 C.F.R. § 402.16(b).  In this case, the "new

information" is the transfer of the Legacy Lands to USFS, which created seven

subunits that now have over 75% National Forest lands, and are therefore now

subject to the Amendment 19 numeric objectives, as discussed above.  The "effects"

of new application of the Amendment 19 objectives "may affect" grizzly bears in

those seven subunits, or as a whole, "in a manner or to an extent not previously

considered" because the land transfer occurred in 2010, and at the time the previous

Amendment 19 biological opinions were published in 1995 and 2005, the land

transfer had not yet happened, and the objectives did not apply to these seven

subunits. Accordingly, this case fits squarely within the regulatory requirement for

reconsultation. 50 C.F.R. § 402.16(b).

After this lawsuit was filed, the agencies produced a 2014 biological opinion

that addresses Amendment 19, but that opinion merely provides an amended

schedule for compliance with objectives for the 40 subunits that were already

subject to those objectives:

> Of the 40 subunits with >75% Forest lands, 26 met all A19
> management direction or amended management direction at the end of
> 2012 []. An additional four subunits have decisions or commitments to
> meet all A19 management direction or amended management direction
> []. The remaining 10 subunits do not meet and do not have decisions to
> meet all A19 management direction. Four subunits [] have decisions to
> improve conditions towards the A19 management direction. These
> subunits did not meet all management direction by the end of 2012, but
> progress continues to be made. The proposed action would extend the
> time frame to meet the A19 management direction to 2018 or until
> Forest Plan revision is completed, whichever comes first.

FS-0061803; *see also* FS-0061898 ("40 relevant subunits"). The opinion does not

acknowledge the application of the numeric objectives to the seven Legacy Lands

subunits that are newly subject to those objectives, much less set a schedule for

compliance for those seven units.

Instead, in the 2014 biological opinion, FWS incorrectly presumes that the numerical objectives would not apply to the seven Legacy Lands subunits until 2018, which is the year the Fiber Supply Agreement expires:  "The former Plum Creek lands will remain under the [Swan Valley Grizzly Bear Conservation Agreement] until the encumbrance expires in December of 2018 and the direction for management of those lands is changed . . . ."  FS-0061831,0061847,0061869. Thus, the agencies plan to reconsult on Amendment 19 in 2018 when the Fiber Supply Agreement expires, or when the Flathead Forest Plan is revised, whichever happens first.  FS-61905.

Contrary to their erroneous representations in the 2014 biological opinion, the agencies now acknowledge that the Amendment 19 numeric objectives apply now to the seven Legacy Lands subunits.  Nonetheless, the agencies have not yet reinitiated consultation on Amendment 19 to address this issue.  As noted above, the premise for waiting until 2018 was that Amendment 19 objectives would not apply to the Legacy Land subunits until 2018; as set forth in this Court's opinion, that premise is wrong.

A biological opinion based upon an incorrect application of forest plan standards cannot stand.  *See Swan View Coal. v. Barbouletos*, 2008 WL 5682094 at *1 (D. Mont. 2008)(FWS cannot use a "baseline for measurement and analysis

25

[that] accepts illegal use and then proceeds based on that faulty idea." FWS's 2014 biological opinion accepts USFS's unlawful application of Amendment 19, which does not apply the numeric objectives to the seven Legacy Lands subunits, and "proceeds based on that faulty idea." *Id.* This Court should reject FWS's reliance on USFS's unlawful application of Flathead Forest Plan Amendment 19 in this case, just as it rejected the FWS's reliance on USFS's unlawful application of Flathead Forest Plan Amendment 24 in *Barbouletos*.

In *Barbouletos*, this Court also addressed the FWS Amendment 19 biological opinions from 1995 and 2005, which require that 40 grizzly subunits comply with the numeric objectives by 2009: "the Forest Service need only fail to complete the prescribed road decommissioning by the specified dates to exceed approved take and trigger re-initiation . . . With narrow exceptions, the implementation deadline for Revised Amendment 19 is the end of 2009. []. The deadline is a clear trigger for re-initiation." *Id.* at *23. As discussed above, while FWS did belatedly issue a new biological opinion to set forth a new implementation schedule for those 40 units in 2014, it has not yet set forth a schedule for the Legacy Lands subunits. FS-0061803. Thus, just as it has done for the 40 subunits originally subject to the Amendment 19 objectives, FWS must now issue a biological opinion that (a) addresses the application of the Amendment 19 objectives to the seven affected

26

Legacy Lands subunits, (b) sets a schedule for compliance as part of an incidental take statement, and (c) sets a deadline upon which failure to comply with the objectives will act as an automatic trigger for reinitiation of consultation. *See Barbouletos*, 2008 WL 5682094 at *23.

As discussed above, when reconsultation on a forest plan occurs, any timber sale implementing that forest plan must be enjoined pending the completion of reconsultation. 16 U.S.C. § 1536(d); *Lane Cnty,* 958 F.2d at 295 ; *Pac. Rivers*, 30 F.3d at 1057. Therefore, until the agencies complete reconsultation on the effects of Amendment 19 on the seven Legacy Lands subunits, all timber sales within those subunits must be enjoined. For this reason, the Glacier Loon injunction must remain in place until reconsultation on Amendment 19 is completed.

## III. CONCLUSION

For all of the reasons set forth above and in prior briefing, the Coalition respectfully requests that this Court deny the agencies' motion to dissolve the injunction against the Glacier Loon Project. *See e.g. Native Ecosystems Council v. Krueger*, 2015 WL 5164994 at *2 (D.Mont. 2015) (denying motion to dissolve timber sale injunction); *Weldon*, 2011 WL 3348000 at *4 (same); *Friends of Wild Swan v. USFS*, 2013 WL 1295339 at *1 (D.Mont. 2013)(same).

Respectfully submitted this 30th Day of October, 2015.

_/s/Rebecca K. Smith_
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 6,464 words, excluding the

caption, table of authorities, table of contents, signature blocks, and certificate of

compliance.  Under Local Rule 7.1(d), a table of contents and table of authorities is

provided for this brief.

/s/ Rebecca K. Smith
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C.

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs

29