IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SWAN VIEW COALITION, FRIENDS OF THE WILD SWAN, NATIVE ECOSYSTEMS COUNCIL, and ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiffs, <br><br> vs. <br><br> CHIP WEBER, Flathead National Forest Supervisor, FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior, <br><br> Defendants. | CV 13–129–M–DWM <br><br> ORDER |

In June 2013, Plaintiffs Swan View Coalition, Friends of the Wild Swan, Native Ecosystems Council, and Alliance for the Wild Rockies ("Plaintiffs") filed a lawsuit challenging the Glacier Loon Fuels Reduction and Forest Health Project ("the Project") under the Environmental Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), and the National Forest Management Act ("NFMA"). On September 25, 2014, summary judgment was granted in favor of Defendants on all of Plaintiffs' claims except four, two of which relate to the

1

Project. (Doc. 51.) First, the Court held the United States Forest Service ("Forest Service") improperly reached a "no effect" determination for water howellia and bull trout under the standards of ESA Section 7 by failing to recognize the low threshold for a "may affect" determination. (*Id.* at 20-21.) Second, the Court held that the Forest Service erroneously determined that numerical objectives under Amendment 19, which provides protections for grizzly bears, did not apply to certain subunits in the Project area. (*Id.* at 26-27.) The Project was enjoined, and these matters were remanded to the agency. (*Id.* at 55.)

Defendants move to lift the injunction on the grounds that the Forest Service and the United States Fish and Wildlife Service ("Fish and Wildlife Service") have completed the necessary analysis. (Doc. 86.) That motion is denied. While the agencies have met their Section 7 obligations for all three species, a supplemental environmental assessment ("EA") is required. As the parties are familiar with the facts surrounding the Project, they are not restated below.

## SUMMARY CONCLUSION

The agencies' conclusion that the Project may affect but is not likely to adversely affect water howellia, bull trout, and grizzly bears is not arbitrary or capricious. The agencies considered the relevant factors and articulated a rational connection between the facts surrounding the Project and its impact on all three

species. Nevertheless, NEPA's statutory obligations require the preparation of a supplemental EA due to the application of the incorrect Forest Plan Amendment 19 access objectives in the original EA. Plaintiffs' remaining arguments as to reconsultation on the Canada lynx and Amendment 19 lack merit.

LEGAL STANDARDS

I. **Rule 60(b)**

Rule 60(b) allows courts to "relieve a party or its legal representative from a final judgment, order, or proceeding [if] . . . the judgment has been satisfied, released, or discharged." Fed. R. Civ. P. 60(b)(5). A party seeking dissolution of an injunction may meet its initial burden by showing that there has been a significant change in facts or law. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992).

II. **The Administrative Procedures Act ("APA")**

Courts review claims regarding the ESA, NEPA, and NFMA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706 *et seq. See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (ESA and NEPA); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) (NEPA and NFMA). Under the APA, a "reviewing court shall hold unlawful and set aside agency action . . . found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The court's scope of review is narrow, and the court is "not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011). An agency's actions are valid if it "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation and internal quotation marks omitted). So long as the record supports the agency's decision, that decision should be upheld even if the record could support alternative findings. *Arkansas v. Oklahoma*, 503 U.S. 91, 112-13 (1992). Review of the agency's action is "highly deferential, presuming the agency action to be valid." *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).

## ANALYSIS

**I. ESA Section 7**

Pursuant to Section 7(a)(2) of the ESA, each federal agency ("action agency") must, in consultation with the Fish and Wildlife Service or the National

4

Marine Fisheries Service (the "consulting agency"), ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species. 16 U.S.C. § 1536(a)(2). If a listed species or critical habitat may be present, an action agency must determine whether the action "may affect" the listed species or critical habitat. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.13, 402.14. If a "may affect" determination is made, the action agency must pursue either "formal" or "informal" consultation. In informal consultation, the action agency may provide a "biological assessment" to the consulting agency evaluating "potential effects of the action" on species that "may be present in the area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.02, 402.13. If the action agency concludes the proposed action may affect but is not likely to adversely affect the listed species, and if the consulting agency concurs in writing, then no further consultation is necessary. 50 C.F.R. § 402.13. If, however, the action agency concludes that the proposed action is likely to adversely affect a listed species, "formal consultation" must be undertaken. 50 C.F.R. §§ 402.13, 402.14.

The species at issue on remand are bull trout, water howellia, and grizzly bears. The agencies have met their Section 7 obligations as to all three species.

### A. Bull Trout and Water Howellia

In its initial analysis, the Forest Service concluded that the Project would have "no effect" on bull trout and bull trout critical habitat because they were not present in two of the four watersheds, N2:26709-10, and there was only a chance for a small amount of increased sedimentation in the remaining two, *id*; V2:44627-30. The Forest Service also made a "no effect" determination for water howellia on the grounds that the Project imposes a 300' buffer between Project activity and ponds that either currently hold howellia or could support it. J1:16384, 16393; V2:44520-21; V3:44986. This Court held that the Forest Service's determination was arbitrary and capricious in both instances due to the low "may affect" threshold and remanded for further analysis. (Order, Doc. 51 at 20-21, 55.)

Following remand, the agencies met their ESA Section 7 obligations in regards to water howellia and bull trout.[1] The Forest Service prepared amended biological assessments and concluded that the Project "may affect but is not likely to adversely affect" water howellia, bull trout, and bull trout critical habitat. (Ex. B: Bio. Assess. for Threatened Plants ("Plant Assessment") (Feb. 12, 2015), Doc. 87-2 at 20; Ex. C: Bio. Assess. for Bull Trout ("Bull Trout Assessment") (Jan. 2015), Docs. 87-3, 87-4, 87-5 at 9.) According to the Plant Assessment, effects to water howellia are discountable as they are extremely unlikely to occur, (Doc. 87-

---

[1] Plaintiffs did not address either bull trout or water howellia in their response brief.

2 at 20), and, if the effects did occur, they "would be immeasurable" and mitigated by a 300' no-ground-disturbance buffer and adapted road maintenance best management practices for roads that existed prior to listing, (*id.* at 14-15). Similarly, the Bull Trout Assessment states that the amount of sediment deposited by the Project is expected to be "so small it would not degrade or impact water quality or fish habitat" on Kraft Creek, (Doc. 87-5 at 9), and "too trivial to actually impair bull trout use of Lindbergh Lake or [the] migratory corridor of the Swan River," (*id.* at 15).[2] The Fish and Wildlife Service concurred in the Forest Service's determinations. (Ex. E, Doc. 87-7 at 4 (water howellia), 5-6 (bull trout).) The agencies' Section 7 analysis for water howellia, bull trout, and bull trout critical habitat is neither arbitrary nor capricious.

## B. Grizzly Bears

The Court has not yet ruled on whether the agencies' Section 7 analysis regarding the grizzly bear is arbitrary and capricious, waiting to do so until the Forest Service considered the correct Amendment 19 numerical access objectives relating to grizzly bear under the Forest Plan. (Order, Doc. 51 at 27, 55.) Following remand, the Forest Service concluded that baseline access conditions in

---

[2] Additionally, the two portions of the Project expected to cause the most significant sediment discharge have already been completed. (Doc. 87-4 at 9-10 (noting that the decommissioning of 0.37 miles of road and culvert, which were the largest sediment sources in network, has already been completed); *id.* at 15 (noting that decommissioning of roads FR 10732, 10733, and 10734 largely took place before injunction, and only the first few hundred feet of FR 10732 remain unfinished).)

the Glacier Loon and Buck Holland subunits "may affect and are likely to adversely affect" bears but confirmed its previous determination that the Project itself "may affect but is not likely to adversely affect" bears. (Amend. Bio. Assess. for Threatened & Endangered Terrestrial Wildlife Species (Feb. 4, 2015), Ex. D, Doc. 87-6 at 4, 27.) In its letter of June 15, 2015, the Fish and Wildlife Service agreed that the Project-related effects of the proposed action, as opposed to the effects related to existing access conditions, will not result in adverse effects to grizzly bears.[3] (Ex. E, Doc. 87-7 at 7.) The Fish and Wildlife Service also relied on its 2014 and 1995 first-tier programmatic Biological Opinions on Amendment 19 to find that the adverse effects related to existing access conditions were adequately analyzed in those programmatic biological opinions. (*Id.* at 8-9.) The Fish and Wildlife Service further concluded that the Project is in compliance with the incidental take statements of those opinions. (*Id.* at 7-9.)

Plaintiffs insist that the agencies' "may affect is not likely to adversely affect" determination is arbitrary and capricious on the grounds that it ignores the agency definitions of "not likely to adversely affect" and "likely to adversely affect." Plaintiffs argue the Project is likely to adversely affect grizzly bears by causing measurable reductions in hiding cover, forage, and security and

---

[3] While the first page of the Fish and Wildlife Service's informal consultation states that the Forest Service made "a determination of may affect, likely to adversely affect grizzly bears," the remaining analysis is consistent with a "may affect not likely to adversely affect" determination. (Doc. 87-7 at 3, 8.)

8

temporarily increasing adverse effects above existing baseline levels.  This issue is a close call; however, the agencies have provided a close look and adequate reasons for their conclusion that the Project is not likely to adversely affect the bears, making deference to their decision appropriate.

Plaintiffs insist that the definition of "may affect is likely to adversely affect" as outlined in the agencies' guidance materials mandates an adverse finding.  Pursuant to the "Final ESA Section 7 Consultation Handbook (March 1998)," "[i]n the event the overall effect of the proposed action is beneficial to the listed species, but is also likely to cause some adverse effects, then the proposed action 'is likely to adversely affect' the listed species."  (Doc. 87-12 at 19.)  Accordingly, a "may affect is likely to adversely affect" finding is appropriate unless the effects are "discountable, insignificant, or beneficial."  (*Id.*)  The Project's effects are not entirely beneficial nor discountable because they are expected to have direct and indirect effects on forage, hiding cover, habitat security, and bear displacement.  (Doc. 87-6 at 26.)  The question then is whether they are "insignificant."

"Insignificant effects relate to the size of the impact and should never reach a scale where take occurs."  (Doc. 87-12 at 19-20.)  "Based on best judgment, a person would not . . . be able to meaningfully measure, detect, or evaluate insignificant effects."  (*Id.* at 20.)  Minimal, temporary displacement of grizzly

bears due to road opening and closing does not necessarily constitute an adverse effect. *See Alliance for the Wild Rockies v. Bradford*, 720 F. Supp. 2d 1193, 1212 (D. Mont. 2010). However, there may be adverse impacts if displacement is significant. *Id.* (citing *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 390 F. Supp. 2d 993, 1006-09 (D. Mont. 2005)). In *Bradford*, this Court considered three projects involving construction of more than 5 miles of permanent and 9 miles of temporary roads, impacts on over 3,000 acres of core grizzly bear habitat, and a likelihood of temporarily displacing bears from an additional 5,000+ acres. *Id.* Additionally, there were other projects in the area impacting the bears. *Id.* at 1213. Despite these effects, this Court concluded that the agencies adequately explained the reasons for their "may affect but not likely to adversely affect" conclusion—including, *inter alia*, long-term increases in core areas and decommissioning roads—and the Court deferred to that reasoning. *Id.*

Here, like in *Bradford*, the Forest Service determined the short term effects are sufficiently minimal and adequate mitigation measures have been taken to justify a "may affect but not likely to adversely affect" finding. The Project is expected to have direct and indirect effects on forage, hiding cover, habitat security, and bear displacement. (Doc. 87-6 at 26.) The bears' foraging habitat is expected to be reduced by 320 acres, and their hiding cover by 1,042 acres. (*Id.* at 12-13.) 5.9 miles of temporary roads are to be constructed. (*Id.* at 14-15.)

10

Additionally, 16 miles of existing gated or bermed roads would be used for accessing proposed cutting units. (*Id*. at 15.) However, the Forest Service determined that forage production would begin to increase again within 5 years and that the approximate 1,042-acre reduction in hiding cover amounts to only a 2% reduction in hiding cover in the Project area (from 70% to 68%). (Doc. 87-6 at 13.) While open motorized access density and total motorized access density are expected to increase temporarily during implementation, there would be no net increase in open or total motorized road densities and no net decrease in security core at the completion of the Project. (*Id.* at 21.) To the contrary, "[a]s a result of proposed decommissioning, open road densities would decrease 0.1% in the Glacier Loon subunit; total road densities would decrease approximately 3% in the Glacier Loon subunit and 0.1% in the Buck Holland subunit." (*Id.* at 17.) The Forest Service has also taken steps to mitigate the potential impacts by (1) not engaging in activity in security core or denning habitat, (2) maintaining vegetative screening along open roads, (3) restricting activity based on inactive subunit management guidelines, and (4) limiting most activity to the denning period. (*Id.* at 26-27.) These mitigation measures go beyond those taken in *Bradford*.

Considering those mitigation efforts in conjunction with the potential effects, the Forest Service determined the Project will not adversely affect the grizzly bear. The Fish and Wildlife Service concurred, concluding that "with the

11

exception of effects related to the existing access condition, the remaining effects to grizzly bears as a result of the proposed action would be insignificant and/or discountable." (Doc. 87-7 at 8.) Because the agencies have provided a close look at the effects of the Project and reasons for their conclusion, their determination is neither arbitrary nor capricious.

Plaintiffs' "take" argument does not alter this conclusion. Plaintiffs insist the take expected to occur under the Project necessarily requires a "likely to adversely effect" conclusion. However, the take referenced by Plaintiffs is that in existence in the status quo, i.e., the subunits' current inability to meet Amendment 19's numerical access objectives, and temporary access increases. (*See* Doc. 87-7 at 8.) As discussed in this Court's previous order, because the access objectives are meant to be achieved over time, noncompliance in the present or immediate future does not amount to unpermitted take. (*See* Doc. 51 at 31.) Additionally, the Project is expected to have a net positive benefit as it relates to access percentages, arguably a step in the right direction for achieving the access objectives and reducing existing take.

The agencies' conclusion that the Project "may affect but not likely to adversely affect" the grizzly bear is neither arbitrary nor capricious.

## II. Further Consultation

The Forest Service determined that the Section 7 analysis of bull trout,

water howellia, and grizzly bears did not generate significant new information on environmental effects that would require supplementation of the Project's EA. (*See* Ex. F, Doc. 87-8 to 87-11.) Plaintiffs insist a supplemental EA is necessary to address the correct Amendment 19 access objectives. Plaintiffs are correct.

NEPA imposes on federal agencies a continuing duty to supplement existing EAs and EISs in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); *see also Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 372-73 (1989); *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000). Agencies may use non-NEPA environmental evaluation procedures "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Alexander*, 222 F.3d at 566. However, "once an agency determines that new information is significant, it must prepare a supplemental EA or EIS," and a supplemental information report cannot be used to present analysis that should have been present in the original NEPA document. *Id.*

In *Olympic Forest Coalition v. United States Forest Service*, the district court concluded that a supplemental EA was required where the agency applied objectives under a 2004 Record of Decision in the original EA and the 1994 Record of Decision was subsequently reinstated. 556 F. Supp. 2d 1198, 1201-02

(W.D. Wash. 2008). As is the case here, there was no dispute that the Forest Service applied the incorrect standard in the original EA. *Id.* at 1204. The district court found that error made the original EA "deficient as a matter of law," concluding that the agency could not simply say the existing analysis was consistent with the stricter objectives when they were not applied in any NEPA document. *Id.* at 1205-06. The situation here is similar.

Here, the Forest Service runs afoul of NEPA by using a non-NEPA document to argue that the information included in the current EA is consistent with the access objectives it failed to apply. (*See* Ex. F, "Determination of Whether Supplementation of the Glacier Loon Fuels Reduction and Forest Health Environmental Assessment is Required," Doc. 87-8 at 9.) The failure to include information that should have been in the original EA but was not cannot be excused by the fact the information in the existing EA would also be accurate had the correct standards been applied. *Olympic Forest Coalition*, 556 F. Supp. 2d at 1207-08. Nor can the agency's failure be excused by including the necessary information in a non-NEPA document. *Alexander*, 222 F.3d at 566-67. While Defendants are correct that any changes to the EA would likely be superficial, such post hoc justifications are impermissible. *Olympic Forest Coalition*, 556 F. Supp. 2d at 1207-08.

The Forest Service admits that the subunits do not achieve the Amendment

19 standards even prior to project implementation when the correct access objectives are applied. (Doc. 87-8 at 6; Doc. 87-6 at 21.) That admission directly contradicts the language in the current EA, which states: "All alternatives meet this standard and achieve A19 numerical objectives before and following implementation of the proposed activities." (EA, 3-240.) As these access objectives bear directly on impacts to the environment, it cannot be said that their incorrect application is insignificant. Additionally, the Forest Service's only memorandum discussing the correct objectives was not open to public comment or subject to appeal. (*See* Doc. 87-8.) Therefore, it cannot be said that the memorandum "serve[d] practically as an important contribution to the decision making process." *See Alexander*, 222 F.3d at 567. Accordingly, it was arbitrary and capricious for the Forest Service to not prepare a supplemental EA.

That said, the Court's previous remand order complicates matters. The Court did not make an explicit ruling on whether the application of the incorrect Forest Plan standard was an independent NEPA violation;[4] nevertheless, it held that the Forest Service applied the incorrect access objectives. (Doc. 51 at 55.) Defendants emphasize the absence of a specific NEPA mandate in the remand language, arguing that "[t]he Court did not order the agencies to take any steps

---

[4] This claim was pled in Plaintiffs' Second Amended Complaint, (Doc. 19 at 72-75, 93), but was only briefly addressed in the initial summary judgment briefing, (Doc. 22 at 22 ("[F]ailure to demonstrate compliance with 19/19/68 also violates NEPA.")).

under [NEPA] on remand with respect to the [] Project." (Doc. 87 at 28.) Contrary to Defendant's argument, the necessity of a supplemental EA under these circumstances is not based on a specific mandate included in this Court's original remand order, but instead the Forest Service's continuing statutory duty under NEPA. *See Alexander*, 222 F.3d at 566-67. The Court's "decision did not create these requirements. They stem from NEPA, NFMA and the Forest Service's own [forest plan]. The Forest Service knew or should have known that it needed to provide this information and analysis at the time it prepared the original [EA]." *Id.* at 567. The Forest Service's recognition of that fact is evident from its independent decision to draft a memorandum discussing the potential need for a supplemental EA. (*See* Doc. 87-8.) Accordingly, the agency must comply with its statutory obligations before the injunction will be lifted.

## III. Amendment 19 Reconsultation

Plaintiffs argue that the Project should remain enjoined so that reconsultation on Amendment 19 can occur. Plaintiffs did not raise this argument at the summary judgment stage, (*see* Doc. 22), and it will not be addressed now, s*ee Bradford*, 720 F. Supp. 2d at 1217 n.11 (even though the plaintiff pled a particular NEPA claim, it was not briefed so the court did not consider it).

## IV. Lynx Reconsultation

Plaintiffs further argue that the Project should remain enjoined until the

Forest Service engages in programmatic Section 7 reconsultation for the Canada lynx, relying on the Ninth Circuit's decision in *Cottonwood Environmental Law Center v. United States Forest Service*, 789 F.3d 1075, 1085-88 (9th Cir. 2015). Summary judgment has already been granted in favor of Defendants on this issue. (Doc. 51 at 38-39.) Additionally, the agencies specifically avoided relying on the Lynx Direction. *Cottonwood*, 789 F.3d at 1082 (stating that project-level consultation cannot make up for programmatic deficiencies when the Fish and Wildlife Service "bases its analysis of those projects largely on the Lynx Amendments"); (*see* Doc. 51 at 39 (discussing reliance on the primary constituent elements)). Notwithstanding the Forest Service's duty to engage in programmatic reconsultation, *Cottonwood* does not require the Project remain enjoined.

## CONCLUSION

The injunction will not be lifted until Defendants comply with their legal and statutory obligations. Accordingly, IT IS ORDERED that Defendant's motion to lift the injunction (Doc. 86) is DENIED.

Dated this 13th day of January, 2016.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT